HANS REES' SONS, INCORPORATED, *v.* NORTH CAROLINA ex rel. MAXWELL, COMMISSIONER OF REVENUE.

No. 334. Argued March 18, 1931.—Decided April 13, 1931.

124

*Mr. Louis H. Porter,* with whom *Messrs. F. Carroll Taylor* and *Kingsland Van Winkle* were on the brief, for appellant.

*Mr. Dennis G. Brummitt,* Attorney General of North Carolina, with whom *Mr. Frank Nash,* Assistant Attorney General, was on the brief, for appellee.

MR. CHIEF JUSTICE HUGHES delivered the opinion of the Court.

The appellant, Hans Rees' Sons, Inc., a corporation organized under the laws of New York, began this action by an application to the Commissioner of Revenue of the State of North Carolina for the readjustment of the income tax assessed against the appellant by that State. The assessment was for the years 1923, 1924, 1925 and 1926, in accordance with the applicable state laws,[1] and the controversy related to the proper allocation of income to the State of North Carolina. The Commissioner of Revenue made his findings of fact and conclusions of law, the appellant's exceptions were overruled and the prayer for revision of the taxes was disallowed. Appeal, waiving a jury, was taken to the Superior Court of Buncombe County, North Carolina. On the trial in that court, evidence was introduced by the appellant with respect to the course of business and the amount and sources of income for the years in question. The appellant admitted that "(a) in assessing the tax the Commissioner of Revenue followed the statutory method . . .; (b) that the valuation of the real estate and tangible property of the taxpayer 'both within and without the State' is correct; (c) that the total net income used as a basis for the calculation of the tax is correct; (d) that the allocation of the net income for purposes of taxation was in full accord with the statute." The contention of the appellant was that the income tax statute as applied to the appellant, upon the facts disclosed, was arbitrary

[1] Laws of 1923, c. 4, § 201; 1925, c. 101, § 201; 1927, c. 80, § 311.

and unreasonable, and was repugnant to the commerce clause and to section 1 of the Fourteenth Amendment of the Federal Constitution. The Superior Court struck out the testimony offered by the appellant, as being immaterial, and held that the statute, as applied did not violate constitutional rights. The judgment dismissing the action was affirmed by the Supreme Court of the State, 199 N. C. 42, 153 S. E. 850. The case comes here on appeal.

As to the portions of the taxes for the years in question, which had been paid by the appellant voluntarily and as to which recovery was denied upon that ground, no question is raised here.

The Supreme Court of the State sustained the ruling of the trial court in striking out the evidence offered by the appellant, but held that, if the evidence were deemed to be competent, it would not change the result. The case may therefore be viewed as though the evidence had been received and held to have no bearing on the validity of the statute. *Fairmont Creamery Co.* v. *Minnesota*, 274 U. S. 1, 5. The evidence was thus summarized by the state court:

" This evidence tended to show that the petitioner " (the appellant here) " was incorporated in the State of New York in 1901 and is engaged in the business of tanning, manufacturing and selling belting and other heavy leathers. Many years prior to 1923 it located a manufacturing plant at Asheville, North Carolina, and after this plant was in full operation dismantled and abandoned all plants which it had heretofore operated in different states of the union. The business is conducted upon both wholesale and retail plans. The wholesale part of the business consists in selling certain portions of the hide to shoe manufacturers and others in carload lots. The retail part of the business consists in cutting the hide into innumerable pieces, finishing it in various ways and man-

ners and selling it in less than carload lots. In order to facilitate sales a warehouse is maintained in New York from which shipments are made of stock on hand to various customers. The tannery at Asheville is used as a manufacturing plant and a supply house, and when the quantity or quality of merchandise required by a customer is not on hand in the New York warehouse a requisition is sent to the plant at Asheville to ship to the New York warehouse or direct to the customer. The sales office is located in New York and the salesmen report to that office. Sales are made throughout this country and in Canada and Continental Europe. Some sales are also made in North Carolina. Certain finishing work is done in New York. The evidence further tended to show that ' between forty and fifty per cent of the output of the plant in Asheville is shipped from the Asheville tannery to New York. The other sixty per cent is shipped direct on orders from New York. . . . Shipment is made direct from Asheville to the customer.'

" The petitioner also offered evidence to the effect that the income from the business was derived from three sources, to-wit: (1) buying profit; (2) manufacturing profit; (3) selling profit. It contends that buying profit resulted from unusual skill and efficiency in taking advantage of fluctuations of the hide market; that manufacturing profit was based upon the difference between the cost of tanning done by contract and the actual cost thereof when done by the petitioner at its own plant in Asheville, and that selling profit resulted from the method of cutting the leather into small parts so as to meet the needs of a given customer.

" Without burdening this opinion with detailed compilations set out in the record, the evidence offered by the petitioner tends to show that for the years 1923, 1924, 1925, and 1926, the average income having its source in the manufacturing and tanning operations within the State of North Carolina was seventeen per cent."

128

According to the assessments in question, as revised by the Commissioner of Revenue and sustained, there was allocated to the State of North Carolina, pursuant to the prescribed statutory method, for the year 1923, 83+ per cent. of the appellant's income; for 1924, 85+ per cent; for 1925, 66+ per cent; and for 1926, 85+ per cent.

The applicable statutory provisions, as set forth by the state court, are as follows:

" Every corporation organized under the laws of this State shall pay annually an income tax, equivalent to four per cent of the entire net income as herein defined, received by such corporation during the income year; and every foreign corporation doing business in this State shall pay annually an income tax equivalent to four per cent of a proportion of its entire income to be determined according to the following rules:

"(a) In case of a company other than companies mentioned in the next succeeding section, deriving profits principally from the ownership, sale or rental of real estate or from the manufacture, purchase, sale of, trading in, or use of tangible property, such proportion of its entire net income as the fair cash value of its real estate and tangible personal property in this State on the date of the close of the fiscal year of such company in the income year is to the fair cash value of its entire real estate and tangible personal property then owned by it, with no deductions on account of encumbrances thereon.

"(b) In case of a corporation deriving profits principally from the holding or sale of intangible property, such proportion as its gross receipts in this State for the year ended on the date of the close of its fiscal year next preceding is to its gross receipts for such year within and without the State.

"(c) The words 'tangible personal property' shall be taken to mean corporeal personal property, such as ma-

chinery, tools, implements, goods, wares and merchandise and shall not be taken to mean money deposits in bank, shares of stock, bonds, notes, credits or evidence of an interest in property and evidences of debt."

Relying upon the decisions of this Court with respect to statutes of a similar sort enacted by other States, the Supreme Court of the State held that the statute of North Carolina was not invalid upon its face. *Underwood Typewriter Co.* v. *Chamberlain,* 254 U. S. 113, 120, 121; *Bass, Ratcliff & Gretton, Ltd.,* v. *State Tax Commission,* 266 U. S. 271, 280–283; *National Leather Co.* v. *Massachusetts,* 277 U. S. 413, 423. In *Underwood Typewriter Co.* v. *Chamberlain, supra,* a statute of Connecticut imposed upon foreign corporations doing business partly within and partly without the State, an annual tax of two per cent. upon the net income earned during the preceding year on business carried on within the State, ascertained by taking such proportion of the whole net income on which the corporation was required to pay a tax to the United States as the value of its real and tangible personal property within the State bore to the value of all its real and tangible personal property. All the manufacturing by the corporation was done in Connecticut, but the greater part of its sales were made from branch offices in other States. It was contended that the tax was an unconstitutional burden upon interstate commerce and that it violated the Fourteenth Amendment in that it imposed a tax on income arising from business conducted without the State. In support of the latter objection, the corporation showed that while 47 per cent. of its real estate and tangible personal property was located in Connecticut, almost all its net profits were received in other States. This Court said: " But this showing wholly fails to sustain the objection. The profits of the corporation were largely earned by a series of trans-

actions beginning with manufacture in Connecticut and ending with sale in other States. In this it was typical of a large part of the manufacturing business conducted in the State. The legislature in attempting to put upon this business its fair share of the burden of taxation was faced with the impossibility of allocating specifically the profits earned by the processes conducted within its borders. It, therefore, adopted a method of apportionment which, for all that appears in this record, reached, and was meant to reach, only the profits earned within the State. 'The plaintiff's argument on this branch of the case,' as stated by the Supreme Court of Errors, 'carries the burden of saying that 47 per cent. of its net income is not reasonably attributable, for purposes of taxation, to the manufacture of products from the sale of which 80 per cent. of its gross earnings was derived after paying manufacturing costs.' The corporation has not even attempted to show this; and for aught that appears the percentage of net profits earned in Connecticut may have been much larger than 47 per cent. There is, consequently, nothing in this record to show that the method of apportionment adopted by the State was inherently arbitrary, or that its application to this corporation produced an unreasonable result." In this view, the validity of the Connecticut statute was sustained.

In the case of *Bass, Ratcliff & Gretton, Ltd.,* v. *State Tax Commission, supra,* the State of New York imposed an annual franchise tax at the rate of three per cent. upon the net income of the corporation. The Court, describing the statute, said that " if the entire business of the corporation is not transacted within the State, the tax is to be based upon the portion of such ascertained net income determined by the proportion which the aggregate value of specified classes of the assets of the corporation within the State bears to the aggregate value of all such classes of

assets wherever located." The corporation in that case was British, engaged in brewing and selling Bass' ale. Its brewing was done, and a large part of its sales were made, in England, but it had imported a portion of its product into the United States which it sold in branch offices located in New York and Chicago. The Court regarded the question of the constitutional validity of the New York tax as controlled in its essential aspect by the decision in *Underwood Typewriter Co. v. Chamberlain, supra.* And, referring to the facts of that case, the Court said: "So in the present case we are of opinion that, as the Company carried on the unitary business of manufacturing and selling ale, in which its profits were earned by a series of transactions beginning with the manufacture in England and ending in sales in New York and other places—the process of manufacturing resulting in no profits until it ends in sales—the State was justified in attributing to New York a just proportion of the profits earned by the Company from such unitary business. . . Nor do we find that the method of apportioning the net income on the basis of the ratio of the segregated assets located in New York and elsewhere, was inherently arbitrary or a mere effort to reach profits earned elsewhere, under the guise of legitimate taxation. . . It is not shown in the present case, any more than in the *Underwood* case, that this application of the statutory method of apportionment has produced an unreasonable result."

In the instant case, the state court, having considered these decisions and held that the Statute of North Carolina was valid upon its face, sought to justify its view that the evidence offered by the appellant was without effect, upon the following grounds:

"The fallacy of this conclusion" (that is, the appellant's contention that the application of the statute had been shown to be unreasonable and arbitrary, and hence

repugnant to the Federal Constitution) "lies in the fact that the petitioner undertakes to split into independent sources, income which the record discloses was created and produced by a single business enterprise. Hides were bought for the purpose of being tanned and manufactured into leather at Asheville, North Carolina, and this product was to be shipped from the plant and sold and distributed from New York to the customer. The petitioner was not exclusively a hide dealer or a mere tanner of leather or a leather salesman. It was a manufacturer and seller of leather goods, involving the purchase of raw material and the working up of that raw material into acceptable commercial forms, for the ultimate purpose of selling the finished product for a profit. Therefore, the buying, manufacturing and selling were component parts of a single unit. The property in North Carolina is the hub from which the spokes of the entire wheel radiate to the outer rim." And, in its final conclusion, the state court said that, if it were conceded that the evidence offered by the appellant was competent, still, as it showed that the appellant "was conducting a unitary business as contemplated and defined by the courts of final jurisdiction," it was "not permissible to lop off certain elements of the business constituting a single unit, in order to place the income beyond the taxing jurisdiction of this State."

We are unable to agree with this view. Evidence which was found to be lacking in the *Underwood* and *Bass* cases is present here. These decisions are not authority for the conclusion that where a corporation manufactures in one State and sells in another, the net profits of the entire transaction, as a unitary enterprise, may be attributed, regardless of evidence, to either State. In the *Underwood* case, it was not decided that the entire net profits of the total business were to be allocated to Connecticut because that was the place of manufacture, or, in the *Bass* case,

that the entire net profits were to be allocated to New York because that was the place where sales were made. In both instances, a method of apportionment was involved which, as was said in the *Underwood* case, "for all that appears in the record, reached, and was meant to reach, only the profits earned within the State." The difficulty with the evidence offered in the *Underwood* case was that it failed to establish that the amount of net income with which the corporation was charged in Connecticut under the method adopted was not reasonably attributable to the processes conducted within the borders of that State; and in the *Bass* case the court found a similar defect in proof with respect to the transactions in New York.

Undoubtedly, the enterprise of a corporation which manufactures and sells its manufactured product is ordinarily a unitary business, and all the factors in that enterprise are essential to the realization of profits. The difficulty of making an exact apportionment is apparent and hence, when the State has adopted a method not intrinsically arbitrary, it will be sustained until proof is offered of an unreasonable and arbitrary application in particular cases. But the fact that the corporate enterprise is a unitary one, in the sense that the ultimate gain is derived from the entire business, does not mean that for the purpose of taxation the activities which are conducted in different jurisdictions are to be regarded as "component parts of a single unit" so that the entire net income may be taxed in one State regardless of the extent to which it may be derived from the conduct of the enterprise in another State. As was said in the *Bass* case with regard to "the unitary business of manufacturing and selling ale" which began with manufacturing in England and ended in sales in New York, that State "was justified in attributing to New York its proportion of the profits earned by the Company from such unitary business."

And the principle that was recognized in *National Leather Co.* v. *Massachusetts, supra,* was that a tax could lawfully be imposed upon a foreign corporation with respect to " the proportionate part of its total net income which is attributable to the business carried on within the State." When, as in this case, there are different taxing jurisdictions, each competent to lay a tax with respect to what lies within, and is done within, its own borders, and the question is necessarily one of apportionment, evidence may always be received which tends to show that a State has applied a method, which, albeit fair on its face, operates so as to reach profits which are in no just sense attributable to transactions within its jurisdiction.

Nor can the evidence be put aside in the view that it merely discloses such negligible criticisms in allocation of income as are inseparable from the practical administration of a taxing system in which apportionment with mathematical exactness is impossible. The evidence in this instance, as the state court puts it, " tends to show that for the years 1923, 1924, 1925, and 1926, the average income having its source in the manufacturing and tanning operations within the State of North Carolina was seventeen per cent.," while under the assessments in question, there was allocated to the State of North Carolina approximately eighty per cent. of the appellant's income.

An analysis has been submitted by the appellant for the purpose of showing that the percentage of its income attributable to North Carolina, for the years in question, did not in any event exceed 21.7 per cent. As pointed out by the state court, the appellant's evidence was to the effect that the income from its business was derived from three sources, buying profit, manufacturing profit, and selling profit. The appellant states that its sales were both wholesale and retail; that the profits from the wholesale business were in part attributable to the manufacturing in Asheville and in part to the selling in New York,

but that the appellant's accountants made no attempt to separate this, and that the entire wholesale profit was credited to manufacturing and allocated to North Carolina. Similarly, it is said that no attempt was made to separate profits from manufacturing in New York from profits derived from manufacturing in Asheville, and that all manufacturing profits were allocated to North Carolina. It is insisted that, in the retail part of the business, the leather is cut into small pieces and finished in particular ways and supplied in small lots to meet the particular needs of individual customers, and that this part of the business is essential to the retail merchandising business conducted from the New York office. The so-called " buying profit " is said to result from the skill with which hides are bought and the contention is that these buying operations were not conducted in North Carolina. If as to the last, it be said that the buying of raw material for the manufacturing plant should be regarded as incident to the manufacturing business, and as reflected in the value at wholesale of the manufactured product as turned out at the factory, still it is apparent that the amount of the asserted buying profit is not enough to affect the result so far as the constitutional question is concerned.

For the present purpose, in determining the validity of the statutory method as applied to the appellant, it is not necessary to review the evidence in detail, or to determine as a matter of fact the precise part of the income which should be regarded as attributable to the business conducted in North Carolina. It is sufficient to say that, in any aspect of the evidence, and upon the assumption made by the state court with respect to the facts shown, the statutory method, as applied to the appellant's business for the years in question operated unreasonably and arbitrarily, in attributing to North Carolina a percentage of income out of all appropriate proportion to the business transacted by the appellant in that State. In this view,

the taxes as laid were beyond the State's authority. *Shaffer* v. *Carter*, 252 U. S. 37, 52, 53, 57.

For this reason the judgment must be reversed and the cause remanded for further proceedings not inconsistent with this opinion.

*Reversed.*