UNION TWIST DRILL CO. *v.* ERWIN M. HARVEY, COMMR. OF TAXES.

February Term, 1944.

Present: MOULTON, C. J., SHERBURNE, BUTTLES, STURTEVANT and JEFFORDS, JJ.

Opinion filed May 2, 1944.

494

*George L. Hunt* and *Ralph E. Tibbetts* (of the Massachusetts bar) for the petitioner.

*Gelsie J. Monti* for the petitionee.

MOULTON, C. J.  The petitioner is a Massachusetts corporation, engaged in the manufacture of small cutting tools, and authorized to transact business within the State of Vermont. At all times here material it has owned and operated four factories; at Athol, Massachusetts, which produces taps and dies, and is its main office; at Mansfield, Massachusetts, known as the E. S. Card Division, where taps, dies, reamers, drills and cutters are manufactured; at Rock Island, in the province of Quebec, the output of which is of the same kind as at the Card Division; and at Derby Line in this State, where taps, dies, reamers and other similar tools are made. The Rock Island plant is just across the boundary between the United States and Canada, and the Derby Line factory is just this side of it, and the two are connected by an enclosed passage way over the river that forms at this point the international boundary. These two plants were originally a distinct and independent establishment, known as Butterfield and Company, but at some time before the present controversy arose they became the property of the petitioner corporation, and together are known as the Butterfield Division.

The proceeding is a petition brought by the petitioner to the County Court within and for Washington County, as provided by P. L. 909, seeking relief from the assessments of franchise taxes made against it by the petitionee, the Commissioner of Taxes for this State, for the years 1934, 1935, 1936, 1937 and 1938. After hearing the County Court filed findings of fact and entered an order which pleased neither party and the cause comes to this Court on the exceptions of both of them.

The Vermont Income and Franchise Tax Act (chapters 39-41 inclusive of the Public Laws) took effect on December 31, 1931. The pertinent provisions of the Act are these: An annual franchise tax computed at the rate of two percent upon its net income for the next preceding fiscal or calendar year, is imposed by P. L. 887 upon

496

every foreign corporation, liable to tax under P. L. Chapter 40, doing business in this State. P. L. 888 provides that: "If the entire business of the corporation be transacted within the State, the tax imposed shall be based upon the entire net income of such corporation for such fiscal or calendar year. If the entire business of the corporation be not transacted within the State and its gross income derived from business done both within and without the State, the determination of its net income shall be based upon the business done within the State and for the purpose of computing such net income the commissioner shall adopt such recommendations and regulations for the allocation of net income as will fairly and justly reflect the net income of that portion of the business done within the state." The form and content of the returns to be filed by the corporation are prescribed in P. L. 893 and 894, and by sub-division XI of the latter section: "If it shall appear to the commissioner that the segregation of assets shown by any report made under this section does not properly reflect the corporate activity or business done in this State, because of the character of the business of the corporation and the character and location of its assets, the commissioner is authorized and empowered to equitably adjust the tax upon the basis of the corporate activity or the business done within and without the State rather than upon capital or assets employed." And P. L. 902 contains the following: "When the commissioner discovers from the examination of the return or otherwise that the income of any taxpayer, or any portion thereof, has not been assessed, he may, at any time within two years after the time when the return was due, assess the same and give notice to the taxpayer of such assessment, and such taxpayer shall thereupon have an opportunity, within thirty days, to confer with the commissioner as to the proposed assessment. The limitation of two years to the assessment of such tax or additional tax shall not apply to the assessment of additional taxes upon fraudulent returns. After the expiration of thirty days from such notification, the commissioner shall assess the income of such taxpayer or any portion thereof which he finds has not theretofore been assessed and shall give notice to the taxpayer so assessed, of the amount of the tax and interest and penalties, if any, and the amount thereof shall be due and payable within ten days from the date of such notice. The provisions of this chapter with respect to appeal shall apply to a tax so assessed. . , ." The foregoing section

is quoted as amended by No. 28, Acts of 1937, but the amendment does not affect any question raised in this cause.

The substance of the findings of fact follows: In 1932 the Commissioner of Taxes issued a ruling, under the authority of P. L. 888, that corporate returns must be prepared on the basis of net income as shown by the Federal Income Tax Returns, and not upon the separate basis of business done in Vermont. Shortly after the passage of the Income and Franchise Tax Act he issued a bulletin for the guidance of taxpayers, which stated that where a corporation did business partly within the State of Vermont, the tax was to be computed under such regulations as he should adopt, and that he was authorized to adjust a tax upon the basis of corporate activity or business done within and without the State rather than upon capital or assets involved. A copy of this bulletin was received by the petitioner's accountants, who wrote a letter of inquiry to the Commissioner, and, on February 20, 1935, received a reply from the Commissioner's assistant informing them that the Department had no special formula for the allocation of the net income of a foreign corporation doing business in Vermont, and advising that a return should be filed in which the income should be allocated upon a basis which "you think fairly represents the net income earned in Vermont," and that if the Department should not feel that the allocation properly reflected the Vermont income, the return would be audited and the petitioner notified of changes made.

Thereafter the petitioner duly filed returns for the years 1934 to 1937, inclusive, which were prepared on the basis that the Derby Line plant was a separate and distinct entity and taxable as such without regard to any question of allocation, and were made upon the profit and loss as shown by the books of the plant. In each instance the amount of gross sales reported covered all sales of products manufactured in Vermont, including the sales of such products as were made at the petitioner's branch stores located in other states. In making these returns the petitioner acted in good faith and without fraud or false statements. The taxes computed thereon were duly paid and received by the Tax Department. For 1934 the books showed a loss of $32415.42 and no tax was paid. For 1935 a tax of $230.79 was paid; for 1936, $1177.51; and for 1937, $2755.99.

On May 16, 1938, the petitioner was informed that the taxes for the years mentioned had been revised in accordance with a formula by which the ratio that the gross sales of the products of the Derby Line plant, as reported in the petitioner's returns, bore to the total gross sales from all its factories, was added to the ratio that the amount of its assets in Vermont bore to its total assets, and one half the sum applied as a multiplier to the net income of the petitioner as shown by its Federal income tax return for each of the years in question, two percent of the resultant figure being, in each instance, the additional tax imposed. Thus, these additional taxes, together with interest from the times the respective returns were due were as follows: 1934, $481.34; 1935, $796.28; 1936, $659.59; 1937, $1570.97; in all, $3508.18. On June 15, 1938, formal notice of the foregoing assessments was sent to the petitioner.

The petitioner filed its return for 1938 when it was due in 1939, which showed a loss for the fiscal year amounting to $9,168.10, and on April 4, 1941, notice was sent to it that an additional tax of $500. had been assessed thereon, with the information that; "This is an arbitrary assessment made to hold the return open beyond the statute of limitation period, April 15, 1941." A like assessment, for the same amount and for the same purpose was made on April 12, 1939, on the return for 1936, due in 1937.

On May 21, 1938, the petitioner through its counsel requested a conference with the Commissioner as provided in P. L. 902. Other requests were made from time to time, to which the replies received from the Tax Department were, in effect, that the Commissioner's time was taken; that a date would be appointed, but that, owing to the volume of work before the Commissioner, no conference could be had before the 1st of July. On September 8 the Commissioner wrote saying that the assessment made by him on June 15, had been suspended and a date for a conference would be fixed. Several other requests were made in writing and in person before and after the assessment of additional taxes on the return of 1938, but no conference could be obtained until June 4, 1941, at which the Commissioner refused to modify or recede from his formula and the petitioner's counsel were sent empty away.

On September 29, 1942, the Commissioner made an order of revision of assessment of the additional taxes for the years 1934 to 1938 inclusive, the entire amount assessed, including interest,

being $4608.73. This order and a demand for payment was dated September 30, and received by the petitioner on October 2. On October 10, the petitioner sent checks for the amount to the Commissioner, with a letter stating that the payment was made under protest, on the ground that the taxes had been assessed at a time beyond that fixed by the statute for the assessment of additional taxes; that the statutory provisions respecting the giving of notice and hearing had not been complied with; and that the net income determined by the Commissioner to be allocable to the State of Vermont was greatly in excess of the amount of net income fairly attributable to the business done within the State. The payment and letter of protest were received by the Commissioner on October 13. The trial court found that the payment was not voluntary, since the petitioner had a right to believe that if it was not made, a warrant would be issued against its property, as prescribed by P. L. 903, or other means taken to collect the taxes, involving costs and embarrassment.

The Commissioner's formula was adopted after an investigation of the corporate activities of the petitioner, in which the latter gave all the information and assistance he required. In his opinion the returns did not properly reflect the business done within this State, and the application of the formula resulted in an equitable adjustment of the tax, as he was authorized to bring about under P. L. 894 XI. In making the assessments he took into consideration the elements of joint purchases and supplies with the resulting effect upon the entire business of the petitioner, the system of joint advertising; the petitioner's arbitrary allocation of selling expenses; the transfer of manufactured goods at a discount from the wholesale, or catalogue, price from the Derby Line factory to the establishments in Massachusetts; the petitioner's arbitrary allocation of the salaries of the general manager and the superintendent of the Butterfield Division between the plants at Derby Line and Rock Island; and his belief that it was impossible correctly to allocate the interlocking transactions of the petitioner, whose local factory operated as a distinct legal unit in Vermont up to a certain time and then became a division of a foreign corporation.

Regarding the foregoing elements of the formula the findings are these: The Derby Line and Rock Island plants have one office and office force and to some extent are operated in connection with

each other. The power for both is generated at Rock Island. The expense of fuel, heat, light and power, and of office stationery is apportioned between the two plants on the ratio that the sales of the products of each bears to the total sales of both during each year. The salaries of the general manager and the superintendent are divided equally between the two plants, on the theory that neither could be operated at a lower administrative cost. The other office salaries were apportioned in 1934, but not according to the exact ratio of sales. The trial court was unable to find upon what basis these salaries were apportioned during the years 1935 to 1938, inclusive. The sales, during the years here material, were substantially less at Derby Line than at Rock Island.

So called "high-speed" steel, averaging in price about 60 cents a pound was purchased by the Derby Line factory from the factories in Massachusetts. During the years 1934 to 1938 inclusive these purchases supplied from 38.7 per cent to 73.6 per cent of all the steel of this quality used at Derby Line. No discount was allowed on quantities above 1000 pounds, and the figures showed that far more than this quantity was purchased during each of the years mentioned.

Manufactured goods were sold by the Derby Line factory to the other plants at a discount of ten per cent from the wholesale price.

The petitioner maintained branch stores in the cities of New York, Chicago and Detroit, at which the products of all of its factories in the United States were kept in stock and sold. The sales made in the States of New York, Illinois and Michigan entered into the computation of taxes paid by the petitioner in those states. The Derby Line factory was charged, as its share of the expense of maintenance of the branch stores, a fixed sum of $4800. each year, although if such expense had been apportioned according to the ratio of sales of the products made at that plant to the sales of goods from the Athol and Mansfield establishments, the amount charged would have been much greater in each year.

The petitioner's main office, at Athol, advertised all of the Company's products in a machinery magazine, referring to all of the various factories; advertisements published by the Card Division, and the Butterfield Division, also referred to all of the factories and the branch stores in this country, and elsewhere. The

expense of the advertisements was billed to, and paid by, each plant without apportionment. The Derby Line factory issued a catalogue each of the years in question, and therein advertised the tools manufactured by it, marked "Butterfield," "Butterfield and Company" or "Union Twist Drill Company, Athol, Mass., U. S. A." as well as the products of the other factories. The main office also published a catalogue in which the ownership of the other factories was indicated and advertised that the company manufactured reamers and machine tools. The catalogue of the Card Division advertised the tools made at Derby Line and at Athol. Each division prepared and attended to the printing of its own catalogue.

The trial court held that the tax paid by the petitioner for 1934 had been illegally assessed, since the Commissioner had not acted within two years after the time when the return was due, as provided by P. L. 902, and must be refunded with interest; that although the assessment for 1935 had been made after the two years had expired, the petitioner had consented to an extension of the statutory period and had therefore waived the limitation; and that the formula employed by the Commissioner in his assessment of additional taxes for the years 1935 to 1938 inclusive should have included as an additional factor the ratio that the wages and salaries paid by the petitioner in the State of Vermont bore to the total wages and salaries paid by it. Accordingly the court computed the additional taxes by applying one third of the sum of the ratios of sales, assets, and wages and salaries for each year to the net income as shown by the Federal return for that year, and taking two per cent of the sum thus obtained as the tax to be paid, and ordered the refund of the excess of the taxes as imposed by the Commissioner.

Exceptions on behalf of the petitioner challenge the legality of the additional assessments (1) because the Commissioner, having failed to adopt such recommendations and regulations for the allocation of net income as would fairly and justly reflect the net income of that portion of the business of the petitioner done within the state, in accordance with P. L. 888, and having denied the petitioner an opportunity to confer with him with regard to the assessments within 30 days after the making thereof, as provided by P. L. 902, was without authority to make any additional assess-

ments; and (2) because the petitioner's Vermont plant was operated as a separate and distinct business, and the income thereof was clearly identifiable, and had been ascertained, determined and returned, with all due taxes paid; hence no allocation was necessary. By another exception the finding of a waiver of the two year limitation of the additional assessment on the return for 1935 is brought in question. Other exceptions attack the formula adopted and applied by the trial court, because the factor of Vermont sales is taken to include sales from the branch stores. Still other exceptions relate to certain findings of fact, and to the refusal to comply with indicated requests for findings.

Many of the exceptions taken on behalf of the Commissioner will be considered in connection with those of the petitioner.

The enforcement of a tax is a· proceeding *in invitum,* and as against the taxpayer, whoever would enforce the collection of the tax must establish the legality of every step in the taxing process from beginning to end. *Smith and Son* v. *Town of Hartford,* 109 Vt 326, 332-3, 196 A 281; *Richford Savings Bank* v. *Thomas,* 111 Vt 393, 402, 17 A2d 239; *Rowell* v. *School District,* 59 Vt 658, 660, 10 A 754. And, of course, a tax assessed against property not within the jurisdiction of the taxing authority, or against non-taxable property, is illegal and void. *Boyce* v. *Sumner,* 97 Vt 473, 482, 124 A 853; *Nat'l Metal Edge Box Co.* v. *Town of Readsboro,* 94 Vt 405, 409, 111 A 386. Here, however, the primary question concerns the construction to be put upon the pertinent sections of the Income and Franchise Tax Act. The real meaning and purpose of the Legislature is to be sought, and if a fair and reasonable construction discloses it, it is to be given effect, although a taxing statute is not to be extended by implication beyond the clear import of the language used and doubts are to be resolved against the taxing power and in favor of the taxpayer. *First Nat'l Bank* v. *Harvey, Commissioner,* 111 Vt 281, 293, 16 A2d 184; *Richford Savings Bank* v. *Thomas,* 111 Vt 393, 402, 17 A2d 239; *In Re Fulham's Estate,* 96 Vt 308, 314, 119 A 433; *Helvering* v. *Stockholms, etc. Bank,* 293 US 84, 93, 55 S Ct 50, 54, 79 L Ed 211. The intention of the Legislature is to be ascertained, not from the literal sense of the words used, but from a consideration of the whole and every part of the statute, the subject matter, the effects and consequences and the reason and spirit of the law.

*Central Vermont Ry. Inc.* v. *Campbell,* 108 Vt 510, 529, 192 A 197, 111 ALR 175. We have held that a law for the assessment and collection of taxes is to be construed with the utmost liberality, and the construction is not to be critical with a view to defeat the enactment, but a liberal interpretation so as to uphold it if possible. *Clark* v. *City of Burlington,* 101 Vt 391, 397, 143 A 677; *Town of Hartland* v. *Damon's Estate,* 103 Vt 519, 530, 156 A 518.

■ It is not necessary to consider whether the provision of P. L. 888, that the Commissioner shall adopt recommendations and regulations for the allocation of net income is mandatory, or advisory merely (see *Holland* v. *Osgood,* 8 Vt 276, 280; *Warner* v. *Mower,* 11 Vt 385, 394; *Free Press Ass'n* v. *Nichols,* 45 Vt 7, 18); or whether the word "shall" is, in this case, synonymous with "may", as in *Spaulding and Kimball Co.* v. *Aetna Chemical Co.,* 98 Vt 169, 173, 126 A 588, and *Andrizinsky* v. *Phillips,* 97 Vt 21, 22, 121 A 435. The section prescribes no time in which the regulations must be adopted, and there is nothing to indicate a legislative intention that this shall be done before the time when the returns are due. Indeed, it would seem, and we may assume that the fact was recognized by the Legislature, that the intelligent formulation of regulations could only be accomplished after a careful and detailed study and examination of the structures and methods of operation of the four hundred foreign corporations shown by the record to have been transacting business in this State during the years here material. As we have seen, the Income and Franchise Tax Act became effective December 31, 1931. The regulation adopted in 1932 to the effect that a tax of a foreign corporation would be computed upon the basis of the net income as shown by its Federal Income Tax return, was preliminary and did not give information as to the exact method of allocation to be pursued. No other regulation appears to have been adopted until the formula, of which the petitioner was notified on May 16, 1938. But we do not construe the statute as requiring the issuance of regulations at a time before the due date of the returns to be a condition precedent to the legality of the assessment of additional taxes. The result is the same whether the formula be regarded as a regulation under P. L. 888, or a proceeding equitably to adjust the tax, under P. L. 894-XI. There is no claim, and no evidence has been called to our attention, that as a matter of fact the formula was not ap-

·plied to all foreign corporations in the same situation as the petitioner. We hold, therefore, that the contention of the petitioner that, on the ground just considered, the taxes were illegal is without merit.

■ The provision of P. L. 902, that a taxpayer shall have an opportunity to confer with the Commissioner as to an assessment within thirty days after such assessment has been made, was enacted for the benefit of the taxpayer. He may avail himself of the right, or not, as he pleases. No principle of public policy is violated if he sees fit to forego the protection afforded him by the statute. *State Trust Co.* v. *Sheldon,* 68 Vt 259, 260-1, 35 A 177. Here, the petitioner obtained a conference and participated in it— after a long delay, it is true; but by so doing he waived his right to have it within the thirty days. The additional taxes are not illegal because it was not had within the time set by the statute.

The next questions to be considered are whether the additional assessments for the years 1934 and 1935 were illegal because made more than two years after the returns for those years were due, and whether as regards 1935 this period of limitation was waived by the petitioner.

■ The provision of P. L. 902 that "when the Commissioner discovers . . . that the income of any taxpayer, or any portion thereof, has not been assessed, he may, at any time within two years after the return was due, assess the same . . ." is not merely directory, but states a condition precedent to the legality of the tax and is intended for the security of the taxpayer. *Willard* v. *Pike,* 59 Vt 202, 210, 9 A 907. With the proviso that the return shall not be fraudulent it is a limitation of the jurisdiction of the Commissioner, and, as in other instances of lack of jurisdiction over the subject matter, it is not subject to waiver. *Howe* v. *Lisbon Savings Bank,* 111 Vt 201, 207, 14 A2d 3.

■ The Commissioner asserts, and makes the claim the point of certain of his exceptions, that the returns were fraudulent, and therefore the limitation does not apply. But the findings on this point are against him and nothing in the record is pointed out that, in our opinion, required the trial court to reach the conclusion that the petitioner acted otherwise than in good faith. Fraud, as we have often held, is not to be presumed but must be proved. *Darling, Admr.* v. *Ricker,* 68 Vt 471, 473, 35 A 376; *Colston* v. *Bean,* 78

Vt 283, 285, 62 A 1015; *Tillison* v. *Tillison,* 95 Vt 535, 537, 116 A 177; *Dunnett* v. *Shields and Conant,* 97 Vt 419, 429, 123 A 626.

█ The court found, in this connection, that the Commissioner was estopped from claiming that the returns were fraudulent, because he had not imposed the statutory penalty (See P. L. 895, 900) for returns of this nature. An exception to this finding was taken on his behalf on the ground that estoppel was not in issue, since it had not been specially pleaded. No time need be spent upon this question, because, in the light of the finding that the returns were not fraudulent, the finding as to estoppel is immaterial and may be disregarded. *Turner* v. *Bragg,* 113 Vt 393, 35 A2d 356, 361.

█ The Commissioner makes the further contention that the payments of additional assessments were voluntary and has excepted to the finding of the trial court to the contrary. It is found that the petitioner had a right to believe that if the payments were not made, a warrant would be issued or other means of collection, involving costs and embarrassment, would be resorted to as provided in P. L. 903, 904 and 905. Payments made under this belief, accompanied by the letter of protest to which reference has heretofore been made, would be properly held to be involuntary. *White* v. *Hight,* 112 Vt 420, 422, 26 A2d 86. It is argued that the finding is unsupported by the evidence, but it appears to be a reasonable inference which the trial court was entitled to draw from the other facts found. Neither does the fact that the payment did not reach the Commissioner's office within ten days after the date of the notice, by which time it was due and payable under P. L. 902, as amended by No. 28, Acts of 1937, make it voluntary. Whether the date upon which the notice is received by the taxpayer, or the date upon which it is prepared by the Commissioner is to be considered "the date of the notice" is not necessary to decide. It is contended also that the petitioner could and should have applied for a revision of the taxes under P. L. 908, as amended by No. 28, Acts of 1937, and the fact that it did not shows that the payment was voluntary. But the notice of additional assessments, dated September 30, 1942, was entitled "Order of Revision of Assessments" and it appears that both the petitioner and the Commissioner regarded the conference as an application for revision. It would seem to be unnecessary again to

apply for a revision that had already been made. It is not perceived that for this reason the payment was voluntary.

We hold that the additional assessments for the years 1934 and 1935 were illegal because not made within the period prescribed by statute, and the taxes paid thereon must be refunded with interest as provided by P. L. 909. Whether the arbitrary assessments imposed upon the returns for 1936 and 1938 were such assessments as are required by P. L. 888 to be made within two years after the returns were due is a question not raised and therefore not considered.

The petitioner denies the legality of the application of the process of allocation, under P. L. 888, or the process of equitable adjustment under P. L. 894-XI, on the ground that its business in Vermont was conducted as separate and distinct from its business elsewhere, and its books and accounts kept upon that basis, as if it were a separate corporation and taxable as such without regard to any question of allocation. In support of this position the following decisions are relied upon: *Hans Rees Sons Inc.* v. *North Carolina,* 283 US 123, 51 S Ct 385, 75 L Ed 879; *Fisher* v. *Standard Oil Co.* 12 F2d 744; *Standard Oil Co.* v. *Thoreson,* 29 F2d 708; *Magnolia Petroleum Co.* v. *Oklahoma Tax Commission,* 190 Okla 172, 121 P2d 1008; and *Standard Oil Co.* v. *Wisconsin Tax Commission,* 197 Wis 630, 223 N W 85. In the first mentioned case the appellant, a New York corporation, carried on its business there and in North Carolina. It appeared that during the period in question 17% of its entire income was earned in North Carolina, and the assessment, which followed the method of apportionment prescribed by statute allocated approximately 80% of the entire income to that State. It was held that the statutory method as applied to the appellant's business arbitrarily and unreasonably attributed to North Carolina a percentage of income out of all proportion to the business transacted therein, and, therefore, the taxes as laid were beyond the state's authority. The facts in the other cases cited were substantially alike. In each instance the appellants produced and refined crude oil elsewhere, and stored and sold the refined product in the taxing State; and the taxes assessed by methods of allocation of income were held to be invalid. The issues, so far as here material, concerned the construction of the statutes involved. In *Fisher* v. *Standard Oil Co.* the re-assessment was not made in accordance with the statutory method of apportionment, but the court construed the statute of North

Dakota as implying that the business of a foreign corporation done without the State was to be disregarded if that done within the State was "easily and certainly separable from that without, thus creating an exception to the methods of the three sections for the ascertainment of net income." A subsequently enacted North Dakota statute was construed in *Standard Oil Co.* v. *Thoreson,* to the same effect. In *Magnolia Petroleum Co.* v. *Oklahoma Tax Commission,* the statute in question provided that "direct allocation of such income may be made where practicable from the books of account and records of the taxpayer . . . where such methods substantially reflect the net income, and returns made on such basis shall be accepted in computing the tax." It was held that the statute clearly favored direct allocation, and that indirect allocation should be made only when it would prove more practicable than the direct method. In *Standard Oil Co.* v. *Wisconsin Tax Commission,* the statute prescribed the method of allocation. The Court held that the declared legislative purpose was to make a reasonable and equitable distribution of the taxpayer's income, to the end that that part of the income justly assessable in Wisconsin might be ascertained, and, since it appeared conclusively that this could be done by the application of proper accounting methods, the assessment by means of allocation was improper. Each of the above cases, except *Hans Rees' Sons Inc.* v. *North Carolina,* was decided upon the construction of the particular statute involved. In each the tax was laid directly upon income, and was not an excise tax measured according to income earned within the State, but the distinction is unimportant. *Underwood Typewriter Co.* v. *Chamberlain,* 254 US 113, 120, 41 S Ct 45, 46, 65 L Ed 165.

Although our Income and Franchise Tax Act was enacted with the intention that only that part of the income earned by a foreign corporation in this state should be the basis of an assessment, it does not itself prescribe the method of apportionment to be applied, but leaves this to be defined by recommendations and regulations to be adopted by the Commissioner of Taxes, under P. L. 888, or by the process of equitable adjustment under P. L. 894 XI. We do not, however, construe the statute as depriving the Commissioner of the authority given him by these sections because, according to the views of the taxpayer, a given system of accounting results in an accurate representation of its Vermont income. If the case of *Standard Oil*

508

*Co.* v. *Wisconsin Tax Commission,* above mentioned, is to be considered as holding to the contrary, we do not follow it. "Accounting practices for income statements may vary considerably according to the problem at hand. . . . A particular accounting system, though useful or necessary as a business aid, may not fit the different requirements when a State seeks to tax values created by business within its borders." *Butler Bros.* v. *McColgan,* 315 US 501, 507, 62 S Ct 701, 704, 86 L Ed 991.

■ The real issue here concerns the validity and propriety of the formula adopted and applied by the Commissioner. But before we consider it we may dispose of the questions raised by both parties regarding the formula used by the trial court as a basis for apportionment. P. L. 909 gives the court jurisdiction to review the determination of the Commissioner as to the revision of the tax assessed, upon petition of the taxpayer. After prescribing the time in which the petition shall be brought, and served and the term to which it shall be returnable, the section provides: "Thereupon, appropriate proceedings shall be had and the relief, if any, to which the taxpayer may be found entitled may be granted and any taxes, interest or penalties paid, found by the court to be illegally assessed, shall be ordered refunded to the taxpayer with interest at six percent per annum from the time of payment, with costs, and judgment entered accordingly." Nothing in the statute indicates a legislative intent that the court shall adopt a formula and assess taxes thereon. These matters are placed, by the other sections hereinbefore referred to, entirely within the authority of the Commissioner of Taxes. The jurisdiction of the court is confined to passing upon the legality of the assessment made by the Commissioner. It has the power to order a refund, if illegality is shown, which is the relief to which the taxpayer is entitled under the statute, but it cannot make a new assessment or an equitable adjustment of the taxes. In taking this course in the present instance the trial court was in error. In view of this holding it is unnecessary to give attention to the several exceptions which challenge the formula so applied.

■ Here, as in *Bass, Ratcliff and Gretton Inc.* v. *State Tax Commission,* 26 US 271, 280, 45 S Ct 82, 83, 69 L Ed 282, the tax is not a direct tax upon the allocated net income of the petitioner in a given year, but an annual tax for the privilege of doing business within this State measured by the allocated net income accruing from

the business transacted here in the preceding fiscal or calendar year. This is clearly expressed in P. L. 887, 888. In an endeavor to impose upon a foreign corporation authorized to do business here its fair share of the burden of taxation it is a difficult, if not impossible task, specifically to allocate the income earned within the State. *Underwood Typewriter Co.* v. *Chamberlain,* 254 US 113, 121, 41 S Ct 45, 47, 65 L Ed 165; *Hans Rees' Sons Inc.* v. *North Carolina,* 283 US 123, 133, 51 S Ct 385, 389, 75 L Ed 879. Unity of use and management, property outside the state which is correlated in use with property within it, and all the factors of the enterprise are proper for consideration. *Butler* v. *McColgan,* 315 US 501, 508, 62 S Ct 701, 704, 86 L Ed 991; *Ford Motor Co.* v. *Beauchamp,* 308 US 331, 336, 60 S Ct 273, 276, 84 L Ed 304; *Hans Rees' Sons Inc.* v. *North Carolina, supra.* No process of apportionment can be expected to produce an exact result, nor is this essential to its validity. If it were, it might well be said, in the language of *Bullock* v. *Guilford,* 59 Vt 516, 520, 9 A 360, 362, that: "It would be substantially impossible to administer the law under such a rigid rule." What is required is that a formula of apportionment shall not be intrinsically arbitrary and it will be sustained unless it is shown that as applied to the particular case, it operates unreasonably and arbitrarily. *Hans Rees' Sons* v. *North Carolina, supra; Underwood Typewriter Co.* v. *Chamberlin, supra.* The rule just stated finds its equivalent in the provision of P. L. 888 that the regulation adopted by the Commissioner must be such "as will fairly and justly reflect the net income of that portion of the business done within the State." "There is no absolute measure to determine what is 'intrinsically arbitrary,' nor is there any objective method of ascertaining whether or not a formula operates 'unreasonably.' Each case must be decided on its own merits." Huston, "Allocation of Corporate Net Income for purposes of Taxation," 26 Illinois Law Review, 725, 731.

The facts as found in the present case relating to the business methods of the petitioner, the common ownership and control of its various factories, the sales of manufactured goods and material by one factory to another, the system of advertising and the publication of catalogues in which each plant called the attention of customers to the products of the others, and to the maintenance of branch stores at which the tools of all the plants in this country are kept in stock and sold, show that the enterprise is unitary in character.

Methods of apportionment more restricted than the formula adopted by the Commissioner in regard to the factors involved have been sustained as not being inherently arbitrary. In *Underwood Typewriter Co.* v. *Chamberlin, supra,* the statute allocated to the taxing state such proportion of the whole net income of the corporation as the fair cash value of its real and tangible personal property within the state bore to the fair cash value of all the property of that description owned by it. In *Bass, Ratcliff and Gretton, Inc.* v. *State Tax Commission, supra,* the ratio was that which the aggregate value of certain specified classes of assets within the state bore to the aggregate value of such classes of assets wherever situated. In *Ford Motor Co.* v. *Beauchamp, supra,* the tax was measured by such proportion of outstanding capital stock, surplus and undivided profits, plus long term obligations of the corporation as the gross receipts of its business in the state of Texas bore to the total gross receipts or its entire business. Here, the formula takes into account the factors of assets and gross sales within and without the state. It cannot be said to be intrinsically arbitrary.

It remains to consider whether it is shown to operate unreasonably and arbitrarily in the present instance; "One who attacks a formula of apportionment carries a distinct burden of showing by 'clear and cogent' evidence that it results in extraterritorial values being taxed." *Butler Bros.* v. *McColgan,* 315 US 501, 507, 62 S Ct 701, 704, 86 L Ed 991. As we have seen, the petitioner's contention is that its returns, based upon the books of the Derby Line Plant, showed its true net income. The fact that the application of the Commissioner's formula reached a different result is what is claimed to constitute its illegality. But since the business was unitary, the elements of common control and management of the various factories and the business methods pursued, to which reference has been made, and which did not appear in the returns, were proper for consideration in devising and using a method of allocation of income. The fact that the books of account showed a loss for the year 1938 does not impeach the formula. *Butler Bros.* v. *McColgan, supra; Bass Ratcliff and Gretton* v. *State Tax Commission,* 266 US 271, 284, 45 S Ct 82, 85, 69 L Ed 282. The record before us does not make it appear that the Commissioner's formula, as applied, operated unreasonably and

arbitrarily or resulted in the taxation of extra territorial values. The additional assessments for 1936, 1937 and 1938 are sustained.

All the questions raised by the exceptions of both parties have been carefully examined.

*Judgment reversed and judgment that the additional assessments of franchise taxes, and interest, made by the Commissioner of Taxes, against the petitioner, for the years 1934 and 1935, amounting respectively to $481.34 and $796.28, were illegally assessed and a refund thereof, together with interest thereon at 6% from October 10, 1942, is ordered. Let the petitioner recover its costs.*