HOUSEHOLD FINANCE CORPORATION *v.* STATE TAX COMMISSION OF MARYLAND

STATE TAX COMMISSION OF MARYLAND *v.* HOUSEHOLD FINANCE CORPORATION

(Two Appeals in One Record)

[No. 42, October Term, 1956.]

82

*Decided January 17, 1957.*

The cause was argued before BRUNE, C. J., and COLLINS, HENDERSON, HAMMOND and PRESCOTT, JJ.

*Floyd E. Britton,* with whom were *James F. Thrift* and *Guy B. Brown* on the brief, for the Household Finance Corporation.

*Joseph S. Kaufman, Assistant Attorney General,* with whom were *C. Ferdinand Sybert, Attorney General, Norman P. Ramsey, Deputy Attorney General,* and *David Kauffman, Assistant Attorney General,* on the brief, for the State Tax Commission of Maryland.

PRESCOTT, J., delivered the opinion of the Court.

This appeal involves the assessment of the value of the capital stock of a foreign finance corporation and the apportionment thereof, so as to allocate the portion that fairly "represents the business done in this State", for the year 1953.

Household Finance Corporation (Household) was, and is, such a corporation and appealed to the Circuit Court of Baltimore City from an assessment, and allotment (business within and without the State), of its capital stock made by the State Tax Commission (Commission). After consideration of the appeal, the Commission's action was affirmed in the assessment made and partly so in the allocation, but was remanded, with directions, in regard to the remainder of the apportionment. Thereupon, Household appealed to this Court from that part of the decree that affirmed the assessment and denied its contentions concerning the allocation, and the Commission cross-appealed as to the part that remanded, with directions, in regard to the remainder of the apportionment.

Household is a Delaware corporation having its principal

offices at Chicago, Illinois, with regional headquarters in New York, Philadelphia, and Los Angeles, and as to its Canadian subsidiaries, in Toronto, Canada. The taxpayer is engaged in the business of making installment cash loans to consumers. At the end of 1952, it and its wholly owned subsidiaries were so engaged at 577 branch offices in 389 cities of 29 states and 10 Canadian provinces. During 1952, taxpayer was so engaged at 13 branch offices in 6 cities in Maryland.

Except for periodic examinations of these Maryland branch offices by administrative personnel, the administration of the affairs of the taxpayer and of its subsidiaries was outside the state of Maryland. Only branch office operations were conducted in Maryland. Each such office operated in rented quarters and maintained necessary office equipment and operating cash on hand and in bank. Employees consisted of a manager, one or more assistant managers, and a number of steno-cashiers who handled office detail and outside representatives who made outside credit investigations and calls upon delinquent borrowers.

The taxpayer owned all, or substantially all, of the capital stock of 10 subsidiary corporations, nine of whom carried on the same business as the parent company.

The capital stock of the taxpayer was listed on the New York Stock Exchange. In its published annual reports, balance sheets and earnings statements, the subsidiaries, except one, were consolidated with the parent. For the purposes of the figures cited to us, however, this one was consolidated with the others.

None of the U. S. subsidiaries had ever paid any dividends, all profits having been placed back into the business. The only receipts, therefore, from the U. S. subsidiaries have been interest and supervision fees. The taxpayer received no interest or supervision fees from Peoples Industrial Bank, one of the subsidiaries, since that bank was not indebted to the taxpayer and the bank furnished its own administration. The bank had paid no dividends. In addition to interest and supervision fees, the Canadian "subs", however, had for several years paid dividends.

Household's consolidated balance sheet, as of the last day

of 1952, showed assets in excess of $340,000,000; consolidated gross income for that year of approximately $75,000,000; and consolidated net income of over $13,000,000.

Figures in the record, furnished by it, showed a book value of over $102,000,000; consolidated net earnings capitalized at 10% were over $136,000,000; and the average consolidated net earnings for the previous 5 years capitalized at the same percentage were over $114,000,000.

These facts have been set forth in some detail to show the taxpayer operated a very large and extensive business enterprise, with tremendous assets and widespread interests of great value, that seem to demonstrate with clarity and certainty, it was engaged in a unitary undertaking.

Part of the value of the capital stock of this class of corporations is subject to taxation in Maryland. The Commission, as the administrative body in charge of fixing assessments, issues several reporting forms for the taxpayer to complete and return. Household completed Form No. 7 with attached schedules, and listed therein the market price of its stock on January 1, 1953. The Commission incorporated this listing in their aggregate valuation, the details thereof will be shown when we quote from the "Statement of Facts Considered by the Commission on which its findings are Based".

Taxpayer also completed Form No. 8, in which this information was supplied:

1. Gross receipts or earnings from all sources during calendar year 1952 .... $ 61,812,951.26
2. Gross receipts or earnings derived from business done in Maryland during calendar year 1952? ..................... $ 2,481,626.70
3. Value of property (tangible and intangible) in Maryland? .............. $ 10,200,625.92
4. Value of property (tangible and intangible) outside of Maryland?........ $317,034,611.52
5. Income from permanent investments? ..............

With these facts and figures, among many others, before it, the Commission proceeded to assessment. The statutory direction for that type of tax is first, to ascertain the valua-

tion of the capital stock, and then to apportion such part as represents the business done in this State. We will deal with the action of the Commission in that order; but, before doing so, will set forth the laws relating thereto.

The statutory provisions pertinent to the assessment herein are contained in Article 81 of the Annotated Code of Maryland (1951). Sec. 13 (it being Ch. 34, sec. 2, Laws of Maryland, 1952, at the time of the tax herein) required property to be assessed "at the full cash value thereof on the date of finality". Sec. 12 (b) provided for the assessment and taxation of as much of the capital stock of foreign finance corporations "as represents the business done in this State". Sec. 20 (b) required the assessment of the stock of foreign finance corporations doing business in Maryland to be computed in the same manner as domestic finance corporations, the intention being the foreign one shall be assessed on its own account in the same amount as it would have been assessed, on account of its shareholders, if it were a domestic one. Sec. 20 (a) set forth the method of assessing the value of shares of stock in domestic finance corporations (because of sec. 20 (b) above, it also became the method for foreign ones). It directed the Commission to proceed in the same manner prescribed in sec. 19, except (1) that the property and business outside of this State shall be excluded, to the end and intent that so much only of the value of the shares as represented business done in Maryland was to be taxed, and (2) that in apportioning the value of the shares between the business within and without Maryland, it was to be presumed, in the absence of clear evidence to the contrary, that the value of the property and business within Maryland bore to the value of the total business and property, the same ratio that gross receipts or earnings in Maryland (exclusive of income from permanent investments) bore to the total gross receipts or earnings (with the same exclusion). This section made taxes assessed thereunder subject to sec. 19 (e) which stated they shall be taxed to the owners thereof, but may be collected from the corporation. Sec. 19 (a) (because of sec. 20 (a) above, applied to the assessment herein) provided, in part, the Commission shall first ascertain the total aggregate value

of the capital stock by considering: (1) the market value, if any, thereof without reference to abnormal prices, rendering market quotations not a fair index of actual value of stock as a whole; (2) the net earnings or income; and (3) the net value of its assets. Sec. 255 (b) permitted appeals to the Circuit Courts, in equity. It then provided, if the Court found the action of the Commission was unlawful, unreasonable or against the substantial weight of the evidence, it should remand the case to the Commission; otherwise, such action was to be affirmed. It further provided for an appeal to the Court of Appeals. Sec. 1, of the 14th Amend. to the U. S. Constitution says: "* * * nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws".

In an appeal of this nature, the burden is upon the taxpayer to show error committed by the Commission. *State Tax Comm. v. Brandt Cab. Works,* 202 Md. 533, 544, 97 A. 2d 290; *State Tax Comm. v. C. and P. Tel. Co.,* 193 Md. 222, 231, 66 A. 2d 477. And to like effect see *Butler Bros. v. McColgan,* 315 U. S. 501, 86 L. Ed. 991, and *Norfolk and W. Ry. Co. v. N. C.,* 297 U. S. 682, 80 L. Ed. 977, wherein Justice Cardozo said: "We must bear in mind steadily that the burden is on the taxpayer to make oppression manifest by clear and cogent evidence."

Household disputes: (1) the method of assessment of the value of its capital stock as not complying with the requirement of sec. 19; and (2) the gross receipts fraction used as a formula for apportioning capital stock value within and without Maryland, in that it failed to exclude in sufficient amounts to satisfy the provisions of sec. 20 and the constitutional mandates as to due process, and equal protection, of the laws, capital stock value produced by the "property and business" of the taxpayer outside the state in respect to (a) its general administrative offices (called "headquarters"), and (b) its subsidiaries. The learned Court below held with the Commission on (1) and (2) (a), but with Household on (b). The Commission maintains its action on (b) was neither

unlawful, unreasonable nor against the substantial weight of the evidence.

In the record is a "Statement of Facts Considered by the Commission on which its Findings were Based" that, in part, reads:

"The aggregate valuation of the taxpayer's capital stock was fixed by the Commission as follows:

PREFERRED

| | | | | |
|---|---|---|---|---|
| 100,000 shares | 4.4% | at | 102⅝ | $10,262,500 |
| 96,000 shares | 4% | at | 99⅜ | 9,540,000 |
| 100,000 shares | 3¾% | at | 90½ | 9,050,000 |

COMMON

| | | | |
|---|---|---|---|
| 2,844,653 shares | | at | 47.25 | 134,409,800 |

$163,262,300

this valuation being the market price on January 1, 1953, as reported by the corporation in answer to question No. 11 on the taxpayer's report to the Commission. The stock of the corporation being listed on the New York Stock Exchange enabled the Commission to verify the correctness of the taxpayer's market quotations.

"In considering net earnings or income, the Commission was of the opinion that the same amply justified the very active market of the stock, that is to say, the 1952 net earnings, before dividends of $13,925,785 capitalized at 8.5% justified the valuation fixed by the investing public on all the corporation's capital stock. Considering the past five years' average earnings, capitalized at 6.9% would likewise justify the investing public's valuation of $163,262,300.

"In considering net value of the assets, the Commission considered the capital of $63,377,468 and the surplus of $33,366,733, or a total book value of $96,744,201. Realizing this valuation does not take into account earning power and many other intangible assets which are fully evaluated by the investing pub-

lic on an active market such as we have in this case, the Commission gave little or no weight to the net value of assets in fixing the aggregate valuation of the corporation's capital stock."

Household says the Commission was in error in the assessment of the total value of its capital stock at $163,262,300 because it was based solely on the market price of its shares on the New York Stock Exchange on the last day of December, 1952, and in the fixing of that value the Commission failed actually and practically, "to consider" the "net earnings or income", (sec. 19 (a)). It does not complain of the regard given "net value of its assets", but argues sec. 19 (a) is a statutory directive to the Commission for an intelligent and realistic consideration of all the factors enumerated therein, that it failed to gratify. In other words, there is a difference between *saying* a matter has received consideration and in *actually, intelligently* and *realistically* regarding the same. It asks this Court to reverse the valuation and direct the Commission as to how it shall consider earnings.

We think this contention has been completely answered by two decisions of this court, *State Tax Comm. v. C. and P. Tel. Co., supra;* and *Seaboard Comm. Corp. v. State Tax Comm.,* 181 Md. 234, 243, 244, 29 A. 2d 294. In the *Telephone Co.* case the Commission was directed by statute to value each operating unit by *"considering its earning capacity and all other factors* relevant to a determination of its full cash value". (Italics supplied). Here, as in the case at bar, the taxpayer complained the Commission had failed to give *sufficient weight* to net earnings. Judge Collins, for this Court, gave one of the meanings of the word "considering" as "reasonably regarding", quoted from the *Seaboard* case as will be done below; stated the evidence showed the Commission "gave some real consideration to net earnings"; and upheld the assessment.

In the *Seaboard* case, as here, appellant was a foreign finance corporation, and claimed error in its assessment in that the Commission had disregarded two of the factors required to be considered by it, namely, market value and net earnings, and considered only book value. The Court held

the evidence failed to bear this out, and then gave the following interpretation of the statute that has acted as a guide to the Commission ever since:

"We do not think it incumbent on the *nisi prius* court to investigate how far each factor required by the Legislature to be considered entered into the final determination of the assessment. It would clearly be error for the Commission not to consider all of these factors, but that does not mean that an average must be struck between them. The Commission is set up as a body of experts on taxation, and it is intended that its judgment in the absence of clear error should be final on the assessment it makes. It may in one case hold that a combination of all three factors should be used to reach a fair assessment. It may in one case give the market value the chief weight. It may in another rely chiefly on the net earnings, and in another it may base its assessment on the net value of the assets. In each of the four suggested decisions, it may be entirely correct, although each is based upon a different point of view. That is the purpose of the statute, to enable a body of men, selected to investigate such matters, to determine in each case what a fair assessment is, that is, an assessment fair both to the public and to the corporation. Had the Legislature intended that the market value should be the test, it would have said so, and similarly, had it intended any of the others to be the sole test. It clearly did not so intend. * * * It left the decision to the body it set up for the purpose of making it, with only one guide, the presumption set out in sec. 16 (a) already quoted. It appears in the case before us that the Commission did take into consideration all the factors required by it, did exercise its judgment in reaching the conclusion it did, and that while the appellant might prefer a different conclusion, the action of the Commission was not unlawful, unreasonable, or against the substantial weight of the evidence."

See also *Susquehanna Power Co. v. State Tax Comm.,* 159 Md. 334, 358, 151 A. 29.

It is true the assessment is above the book value, which is to be expected. Therein are not reflected the good will and many other value producing intangibles of a keenly managed, well operated, money making business. It cannot be argued seriously that if the physical assets of such corporations as Sears, Roebuck and Co. and The Great Atlantic and Pacific Tea Co., immediately, could be reproduced by other corporations, the value of the corporate stock of the latter would equal the former. We think the "Statement of Facts" and the record clearly show the Commission considered all three factors and exercised its judgment thereon; so, with respect to the assessment of the value of the capital stock of Household, we hold the action of the Commission was lawful, reasonable and supported by the evidence.

We proceed to Household's next contention, that is, 2 (a) and (b).

It maintains the record discloses headquarters property located without the State, of over $22,750,000 that consists of about $178,000 worth of office equipment and nearly the entire balance of cash on hand or in the bank. It claims the situs was outside the territorial limits of Maryland, and both the statute, and constitutional provisions as to due process, and equal protection, of the laws, require capital stock value represented by such property be excluded from the tax base.

It makes the same claim with reference to headquarters business showing salaries there amounted to $1,641,111 or 14.10% of total salaries. It alleges as a matter of common knowledge this includes the development of over-all corporate policy, the acquisition of new capital to lend, the close supervision of the operating branches, the maintenance of accounting records, *et cetera.* It claims none of this property or business produced any gross receipts of consequence at the place where the property was located and the business performed; therefore, an apportionment formula consisting solely of gross receipts within Maryland and total gross receipts has the effect of failing to exclude from taxation in Maryland a proportionate part of the value of taxpayer's capital stock rep-

resented by the property and business of headquarters outside the state. It is the same argument used in practically all the apportionment cases involving unitary enterprises.

State taxation, based on a fair apportionment or allocation of business, property or income within and without the State, is constitutional. *Butler Bros. v. McColgan, supra; Underwood Typewriter Co. v. Chamberlain,* 254 U. S. 113, 65 L. Ed. 165; *Ford Motor Co. v. Beauchamp,* 308 U. S. 331, 84 L. Ed. 304. And the gross receipts formula has been in operation too long and upheld in the courts too frequently to be attacked as unfair or unreasonable *per se* or in the abstract. It likewise is true, an innocuous formula in the abstract and in general application, may prove harmful in particular instances. *Fargo v. Hart,* 193 U. S. 490, 48 L. Ed. 761; *Norfolk and W. Ry. Co. v. N. C., supra.*

The "Statement of Facts", referred to above, showed, that after completing the assessment of total value of capital stock, the Commission proceeded to apportion the same, as follows:

| | |
|---|---|
| Aggregate valuation, capital stock | $163,262,300 |
| Credit for business outside of Maryland | $156,707,800 |

| | |
|---|---|
| Net valuation of capital stock subject to taxation in Maryland | $ 6,554,500 |

The Commission accepted Household's figures on Form No. 8, above, and were of the opinion the value of the property and business in Maryland bore to the value of the total business and property the same ratio which the gross receipts or earnings in Maryland bore to the total gross receipts or earnings. This made a fraction as below:

| | |
|---|---|
| Gross receipts and earnings in Maryland | $ 2,481,626 |

| | |
|---|---|
| Total gross receipts and earnings | $61,812,951 |

As changed into a decimal by the Commission, this amounted to .0401. It then applied this percentage to the aggregate value of the capital stock and determined the valuation of that taxable in Maryland, and reported an assessment of $6,544,500. It will be noted there is a difference of $10,000 in the figures.

This may seem somewhat unusual in the sequence, but it is the manner reported, and the results are the same if a different order of calculation had been made.

Household seems to base its whole case under this heading on three cases and a hearing or case before the Minnesota Board of Tax Appeals, from whence it is difficult to see how they glean solace: *Wallace v. Hines,* 253 U. S. 66, 64 L. Ed. 782; *Hans Rees' Sons v. N. C.,* 283 U. S. 123, 75 L. Ed. 879; *Com. v. Columbia Gas and Electric Corp.,* 336 Pa. 209, 8 A. 2d 404; and *Allied Building Credits, Inc. v. Comm. of Taxation* (Minn. Bd. of Tax Appeals, Doc. No. 253, Oct. 29, 1947, CCH Minn. Tax Reporter), Par. 18044.

*Wallace v. Hines* is a prominent and important case. The state of North Dakota imposed a special excise tax for doing business within her borders equivalent to 50¢ on each $1,000 of the "capital actually invested in the transaction of business in the State", and where it was railroad property extending further than her boundaries the above would mean that proportion of railroad's entire property as the mileage within the State compared with total mileage. The court pointed out: the only reason a State may consider property beyond her borders where taxing property of a foreign corporation is to arrive at a real value of things within it, "when they are a part of an organic system of wide extent, that gives them a value above what they otherwise would possess"; that North Dakota was a state of plains, where the cost of construction was much less than in other areas; that "the great and very valuable terminals" were in other states; and then, held in this case the tax was an unwarranted interference with interstate commerce and a taking of property without due process of law.

The *Columbia Gas and Electric Corp.* case has little analogy to the facts presented to us. Pennsylvania imposed a franchise tax at the rate of five mills upon a taxable value to be computed by dividing total capital stock value into three equal parts. Each part then was required to be multiplied by a fraction. In the first, the numerator was the value of tangible property within the State, and the denominator total tangible property; in the second, gross wages, salaries, *et cetera,*

paid in the State as compared to total wages, *et cetera;* and, in the third, gross receipts within the State as compared to total gross receipts. The corporation was a large one showing assets of some $446,000,000 and capital stock value of some $188,000,000. The great bulk of its activities, which it carried on without the State, consisted in acting as a holding company, it having some 50 subsidiaries. In 1935, it employed in the State tangible property worth (round figures) $331,000, paid wages of $15,000, and received in sales only $31,000; yet, under the formula, it owed $192,000 in taxes. The court stated the corporation was engaged in a multiform business, wherein much of the capital stock value was not "concerned with the functions exercised within the State"; upheld the constitutionality of the act; pointed out this was an "exceptional situation here presented"; then directed that proper allowance be made for capital stock value which bore no relation to privilege.

We have read, with care, the other cases cited, but see no useful purpose in analyzing them. Household seems to lose sight of the unitary type of its operations described in the Court below as a "national ganglion". The vast financial combine which it is, necessarily must have an operating business head. Judgments, decisions and policies made and administered out of headquarters tie together and coordinate the activities of its many field offices. It is by the use of sound business judgment at the seat of management, that the life blood of a financial operation like Household is channeled to those field functions requiring additional capital. Through the operation of its headquarters, and the combined borrowing power which the complex gives thereto, the most advantageous rates of interest may be attained with resultant benefit to all parts of the corporate body. The branches in Maryland, some peculiarly so because of their geographical proximity to territory where similar business was prohibited, contributed to the whole; and, naturally, obtained many benefits therefrom. It indeed, would be difficult to envisage a better illustration of a unitary function than this huge financial concern. We, therefore, decide Household was engaged in a unitary enterprise. *Commonwealth v. Ford Motor Co.,* 350

Pa. 236, 38 A. 2d 329; *Commonwealth v. Quaker Oats Co.,* 350 Pa. 253, 38 A. 2d 325; 38 *Harv. L. Rev.* 531; *Bonbright, Valuation of Property,* Vol. 2, pp. 658, *et seq.*

In *Wallace v. Hines, supra,* the Supreme Court stated, in a situation similar to this, property without the State could not be taken into account "unless it can be seen in some plain and fairly intelligible way that it adds to the value * * * in the State". We think it can reasonably and plainly be seen and understood that the worth of such assets, tangible or intangible, as headquarters office equipment, cash on hand and monies on deposit and the business acumen of the headquarters personnel of a large, co-ordinated, single purpose enterprise such as this, is reflected in the value of capital stock here, even though located outside this State. Both the working capital and the managerial ability which may, for purposes of this opinion, be considered as located at Household's operating headquarters (though the location or locations of the depositary banks are not shown), contribute to the value of the enterprise through making both possible and profitable the operations of the many local offices, which carry on the actual business of lending money and produce practically the entire earnings of the whole organization. Implicit in Household's own argument to the effect that the headquarters and regional office property and business produced no income at the places where located is the concession that their power to produce income, and hence value, has to be effective at the several locations of the actual operating offices.

For many years, it has been recognized, from a practical viewpoint, complete equality in most taxation is impossible. The courts have given expression to the same in various terms. The Supreme Court said, in *International Harvester Co. v. Evatt,* 329 U. S. 416, 422, 91 L. Ed. 390, 394: "* * * this Court has long realized the practical impossibility of a state's achieving a perfect apportionment of expansive, complex business activities * * * and has declared that 'rough approximation rather than precision' is sufficient." As stated by this Court, "* * * an honest State effort to make an apportionment will be upheld unless it produces a 'palpably dis-

proportionate result' \* \* \*". *State Tax Comm. v. W. Md. Ry. Co.,* 188 Md. 240, 246, 52 A. 2d 615.

We, therefore, conclude the action of the Commission in regard to 2 (a) was lawful, reasonable and supported by the evidence.

With regard to 2 (b) it appears the Commission used figures furnished by Household. When analyzed, it is disclosed they present properly *total* gross receipts within the State; but, with reference to *total* gross receipts everywhere, they do not include the actual gross receipts of the subsidiaries, but, only interest, supervision fees and dividends paid by them to the parent company. These figures purported to show gross receipts of Household. They included its own gross revenues (interest on loans made to customers) and interest, supervision fees and dividends paid to it by the subsidiaries. It readily is seen that this does not include actual gross receipts of the subsidiaries (interest paid to them on loans made to customers). The court below calculated that the Commission had computed the business done by subsidiaries outside this State at less than one-half the actual amount on a consolidated gross receipts basis. The dividends, supervision fees and interest received from the subsidiaries in 1952 amounted to only 15 plus % of total gross receipts, while they had produced 30 plus % of consolidated gross receipts. What the Commission actually did can be described in terms of fractions. It was simply this: the Commission, in constructing the fraction to calculate business done within and without the State, used as the numerator total gross receipts within the State; and, in determining the denominator, used, not total gross receipts of the parent company (excluding intercompany transactions) plus total gross receipts of subsidiaries, but total gross receipts of the parent, plus interest, supervision fees and dividends paid to it by the subsidiaries.

We have just determined that Household's business is unitary, and we have upheld the Commission's valuation of it as such, for the Commission has taken the appraisal of the market and the market makes its appraisal of the business as a unit very largely on the basis of the consolidated assets, liabilities and earnings of the parent and its subsidiaries, as

well as on the basis of yield. In allocating the value of the property and business of that entity attributable to Maryland, the statutes under which the Commission is acting require the exclusion of business and property outside of Maryland. These statutes further provide a presumption that "in the absence of clear evidence to the contrary" the proper basis of apportionment is the ratio of gross receipts or earnings in Maryland to gross receipts or earnings outside of Maryland (subject to an exception not here pertinent). We think that the record affords clear evidence that the presumption is not correct in this case, from which it follows that it should not have been applied.

In a few words, the basis for our view is this: if the Commission sees fit to arrive at the total value of a unitary enterprise on a consolidated basis, it cannot in fairness apportion that value as between Maryland and other jurisdictions on a basis which is inconsistent with, and which rejects, an element used in building up that value. Here, of course, that element is the earnings of the subsidiaries. They have been discarded and the gross earnings of the parent company only have been used for the apportionment. The result has been to produce a considerably larger apportionment of value to Maryland than would have been reached if the gross earnings of subsidiaries, rather than the gross income which—on an intercompany basis—the parent company derived from them had been used in determining the ratio of gross receipts in Maryland to gross receipts outside of Maryland.

We have reached the conclusion above stated on the basis of our statute, and we have not found it necessary to seek to determine the limit of the constitutional power of the State in imposing or apportioning a tax such as that here involved.

Our statutes do not prescribe the formula upon which the Commission shall make an apportionment in any case where the gross receipts formula may be found to be inapplicable. There may be some question as to whether or not the order of the Circuit Court limited the Commission to any particular formula in making a redetermination of the value of the capital stock of Household apportionable to Maryland. We think that the Commission is not restricted to any partic-

ular formula or combination of formulas which it may deem proper and which may meet statutory and constitutional tests. It is not the function of the courts to prescribe a formula, but only to see that the action of the Commission, the body of experts by which appraisals and apportionments are to be made, does not involve conflict with a statutory or constitutional limitation. To avoid any doubt on this point, we think that the directions of remand should be modified so as to provide for a redetermination by the Commission of the allocation and apportionment of business done outside of this State on a basis not inconsistent with this opinion.

Accordingly, the order appealed from is affirmed as to the over-all valuation of the capital stock of Household, and as to the allocation thereof as between Maryland and elsewhere it is modified to the extent above stated and, as modified, is affirmed.

> *Order affirmed as to valuation; order modified as to apportionment, and as modified, affirmed; the costs to be paid three-fourths by the appellant and cross-appellee and one-fourth by the appellee and cross-appellant.*

HAMMOND, J., delivered the following dissenting opinion, in which HENDERSON, J., concurred.

The majority of the Court finds that since the State Tax Commission saw fit "to arrive at the total value of a unitary enterprise on a consolidated basis" it cannot, in apportioning to Maryland a share of that total value, reject "an element used in building up that value". It is said that the rejected element is "the earnings of the subsidiaries" and that these earnings "have been discarded" because gross earnings of only the parent corporation, and not consolidated gross earnings, were used in making the apportionment. The majority says the result is to allocate to Maryland a greater value than if local gross receipts had been compared with consolidated gross receipts, and, so, to attribute unlawfully extra territorial values to Maryland.

100

To me the premises of the Court are unsound and, if they be assumed to be true, the conclusions drawn from them are erroneous. The Court's decision requires the Commission, whenever it assesses a multi-state unitary business operating in part through subsidiaries, to disregard the corporate entities of the parent and subsidiary companies. This puts the Commission in a strait jacket that the terms of the statute not only do not prescribe but indeed reject—a strait jacket unjustified by economics or constitutional requirements.

In making the assessment here challenged, the Commission faithfully followed the literal language of the statute. The taxpayer is a corporation doing directly in many states, as it does in Maryland, a small loan business. In other states, usually if not always, because local law makes it necessary, it does the same business through separate corporations, all or substantially all of the stock of which it owns. These corporations are regulated locally, keep separate records and make individual local returns. They have a legitimate purpose and serve a need as distinct legal entities. Indeed it is not even claimed that Household files a consolidated federal income tax return. The parent's gross receipts consist of interest on loans it makes directly and receipts from the subsidiaries—dividends, interest on funds lent and service charges. The parent is the Maryland taxpayer. It furnished the Commission its Maryland gross receipts and its own total gross receipts. The Maryland gross is some 4% of the parent's gross and the Commission applied this percentage to the value of all of the parent's capital stock to find the value of the capital stock of the taxpayer attributable to Maryland.

In determining the value of all of the stock the Commission used market value, as the statute permits. The Court says the appraisal of the market is of "the consolidated assets, liabilities and earnings of the parent and its subsidiaries". The record is barren of evidence of how the market makes its appraisal generally or of the factors it actually, or in probability, took into account in appraising the value of Household's stock. If the Court took judicial notice of these matters, it is suggested that it overlooked to a significant extent a variety of factors that influence the market price of a stock.

They include the nature of the industry and of the particular company, its record, its capital structure, its prospects, its consolidated earnings, and the dividend it pays currently, as well as that it is likely to pay in the not too distant future, that is to say the yield. The market measures the worth of finance company shares particularly by the yield. In any kind of enterprise dividends come only from cash, or its equivalent, actual dollars of the dividend payer—in this case, Household, the parent corporation. Household's dollars available for dividends is its own net income; that is, its own gross receipts less expenses and taxes, plus dividends from subsidiaries, interest on loans to subsidiaries, and charges for advice and services to subsidiaries. Household's assets, appraised in the market, included stock of subsidiaries and the value of the subsidiaries, that is the assets they own and the earnings they make, were reflected in their stock owned by Household, and the debts they owed Household. Household's dividend-available income included receipts from the subsidiaries. It is difficult to see, therefore, how the Court can say accurately that the Commission arrived at the total value of Household on a consolidated basis, if by that is meant, as seemingly was meant, that all operations were conducted, and all measurements of worth made, as if the parent corporation conducted all of its operations without subsidiaries. True, the market took into account to some extent consolidated assets and consolidated earnings, but undoubtedly it reduced its appraisal of so much of them as were represented by stock ownership as opposed to direct ownership. Cf. *National Leather Co. v. Massachusetts,* 277 U. S. 413, 72 L. Ed. 935.

The owner of stock gets only as much of the earnings, less expenses, as the management of the company feels it can and should spare. Earnings of subsidiaries customarily retained, as we are told is the case here, even fully owned subsidiaries, are not given recognition in the market's appraisal of the worth of the parent that they would get if they were paid out as dividends.

The cases show that the state need not pierce the corporate veil and, absent compelling reasons to disregard it in

cases like this, should respect corporate entities. In *Kraft Foods Company v. Commissioner of Internal Rev.,* 2 Cir., 232 F. 2d 118, 124, the Court held that interest paid by a wholly-owned subsidiary on debentures held by the parent was deductible for Federal income tax purposes. The Court said: "But the law generally and the applicable tax law deliberately, through its insistence on taxing affiliates separately, affords significance to and honors the *type* of investment chosen. In consequence, all legitimate and genuine corporation-stockholder arrangements have legal—and hence economic —significance, and must be respected in so far as the rights of third parties, including the tax collector, are concerned." In *People ex rel. Studebaker Corp. of America v. Gilchrist* (Ct. App. N. Y.), 155 N. E. 68, the Court, speaking through Judge Cardozo, held that New York could not tax a parent corporation by reason of the presence in the state of its wholly owned subsidiaries in the state. These principles were recognized—although held inapplicable on the facts—in *Fox Film Corp. v. Loughman,* 259 N. Y. 30, 180 N. E. 885. In *A. C. Lawrence Leather Co. v. Commonwealth* (Mass.), 150 N. E. 851, Chief Judge Rugg spoke for the court. The Massachusetts statute said that if two or more foreign corporations doing business in this commonwealth participated in the filing of a consolidated return of income to the Federal government, they had the option of being assessed for state income tax upon their combined net income. The parent corporation did business in Massachusetts and owned the stock of some eight subsidiaries, four of which did business in the state. The nine corporations filed a consolidated return with the Federal government. Two of the corporations doing business in the state had net income for the taxable period. The other two had suffered losses, so that the combined net income of the four corporations was zero, or less, as was the combined net income of the parent and the eight subsidiaries. The taxing authorities assessed each of the four corporations on their separate net income, so that two of the four doing business in the state were taxed substantially. The court held that only when the entire group filing a consolidated return did business in the state could they elect to be taxed on their joint

return, and since four of the nine did no business in Massachusetts, it was proper to tax separately the four that did do business in the state. In *Commonwealth v. Ford Motor Co.*, 350 Pa. 236, 38 A. 2d 329, it was held that it was proper in making an allocation to the state to include in the multiplicand book value of stock of wholly-owned subsidiaries, without including in the denominators of the allocative fraction the tangible property, wages and gross receipts of such subsidiaries. In *Louisville & N. R. Co. v. Greene*, 244 U. S. 522, 61 L. Ed. 1291, the court was dealing with valuation of the proportion of the capital stock of a railroad attributable to Kentucky. The statute made it necessary to deduct nontaxable assets before arriving at the total value of assets. The taxing authorities had recognized that this must be done, and in applying the capitalization-of-income method of arriving at value, deducted from the total net income the net income from nontaxable securities, and capitalized only the balance. The railroad's criticism was that there had been deducted only the capitalized value of such stock in other corporations as paid dividends, although much of the stock held, while paying no dividends or dividends at a low rate, had large intrinsic value. It produced evidence that such securities were worth some $30,000,000, whereas a capitalization of the income actually paid by the exempt securities, produced a value of only $14,000,000. The court refused to say that the method followed was wrong.

If it be assumed that the Commission's appraisal of Household's stock and the Commission's adoption of that appraisal represents a weighing of its value as if it had no subsidiaries and operated in each state as it did in Maryland, it does not follow that the apportionment that the Commission made, which is made *prima facie* correct by the statute, actually attributed to Maryland more than Maryland's fair share of total value. Gross receipts have meaning as indicators of worth or value only to the extent that they finally emerge as net earnings. *Railway Express Agency, Inc. v. Virginia*, 347 U. S. 359, 366, 98 L. Ed. 757, 764. A subsidiary company may have very large gross receipts and make no money and, in such cases, gross receipts bear little relation to the value of

the stock held by the parent company. The record shows (using round figures) that consolidated gross receipts of $75,000,-000 produced $32,500,000 of consolidated net income before taxes, so that consolidated net was 43.3% of consolidated gross. Maryland gross of $2,400,000 produced $1,200,000 of net income before taxes, so that Maryland net was 50% of gross. In the case of a finance company, assets mean debts due by individuals, banks or governmental subdivisions, largely by individuals. Consolidated assets were $355,000,000 and each dollar of assets produced but 9 cents of net income before taxes; Maryland assets were $10,000,000 and each dollar of Maryland assets produced 12 cents of net income before taxes. Net income after taxes on a consolidated basis was $13,600,000, or 3.85% of consolidated assets. Maryland net income was $518,000, or 5.18% of Maryland assets. Many other comparable figures, revealed by the record show that the value of Maryland assets and Maryland business to the corporation was substantially greater than the average on a consolidated basis. For example, Maryland net income of $518,000 is 3.81% of consolidated net income of $13,600,000. Maryland assets comprise only 2.8% of consolidated assets but they produced 3.81% of the net income of the enterprise. The 3.81% that Maryland assets contributed to consolidated net income almost equals the 4% ratio of Maryland gross income compared to parent gross income which the Commission used. 3.81% of $163,000,000, the total value of all of the parent company's stock as determined by the Commission, is some $6,200,000, which is only $300,000 less than the Commission assessment of some $6,500,000. The Maryland statute clearly intends to tax local values as the State's share of total value as a going concern, a money maker.

As the Court recognizes, a state in assessing a multistate unitary enterprise may take into account the value that all of the assets and business activities wherever located and conducted contribute to local value. The assets and activities may be valued in their organic relations and not merely as a congeries of unrelated items. Where there is a unity of use as well as a unity of ownership there may exist a value that exceeds the aggregate of the values of the separate items of

property. Capital used in any of its branches tends to make every other part of the business more profitable and the advantages flowing from large scale capital resources should and can be distributed equitably among the states in which business is done. Since a state may value the business as a whole and for what it is worth for the purposes of income and sale, inevitably, an allocation need not be limited only to what may be pinpointed in fact or by logic or mathematical exactness actually as being in or attributable by demonstration to the State. Clearly an allocation may reflect a fair share of the total value—and often, if not always this must include extrastate values—and if the apportionment formula is not inherently unreasonable and in the particular case does not produce "a palpably disproportionate" result it will be upheld. Apportionment by a gross receipts ratio has often been approved as inherently reasonable. Under the Maryland Statute the burden is on the taxpayer to show by clear evidence to the contrary that the ratio it sets up results in a manifest disproportion and so that it is not a "rough approximation" of local value. If he cannot show this or that the State had an intention that was equivalent to a fraudulent purpose to discriminate or overtax he cannot upset the assessment either under the statute or on constitutional grounds. *Rowley v. Chicago & N. W. R. Co.*, 293 U. S. 102, 79 L. Ed. 222.

The cases show the extent to which the courts go to give validity to efforts honest in the sense discussed, even in the face of apparently disproportionate results. An example is *Ford Motor Co. v. Beauchamp*, 308 U. S. 331, 84 L. Ed. 304. There Texas levied an annual franchise tax on foreign corporations doing business in the state, measured by a charge upon such proportion of (a) outstanding capital stock; (b) surplus and undivided profits; (c) long-term indebtedness, as the gross receipts from its Texas business bore to its total receipts. Ford's capital, as defined, was over $600,000,000. The book value of all Texas assets was some $3,000,000. Total gross receipts were $888,000,000. Texas gross receipts were $34,000,000. The capital allocable to Texas by the statutory franchise was over $23,000,000. The taxpayer sued to recover all over $3,000,000 it had been required to pay.

The Supreme Court approved the statutory formula, and refused the refund.

In *International Harvester Co. v. Evatt,* 329 U. S. 416, 91 L. Ed. 390, the taxpayer owned factories, sales agencies, warehouses and retail stores in Ohio and other states. Under Ohio's allocation formula, one-half of the value of the stock was multiplied by a fraction whose numerator was the value of all of taxpayer's property in Ohio and whose denominator was the value of all of taxpayer's property. The other half of the value of the capital stock was multiplied by a fraction whose numerator was the total value of "business done" in Ohio and whose denominator was the total value of business done everywhere. The taxpayer objected because the total value of business used as the numerator in the second fraction included the proceeds of goods manufactured within, but sold outside of, Ohio, as well as the proceeds of goods manufactured out of the state but sold in Ohio. A unanimous court sustained the tax, rejecting the contention that it was a levy on sales made outside of the state.

In *Great Atl. & Pac. Tea Co. v. Grosjean,* 301 U. S. 412, 81 L. Ed. 1193, an occupation or license tax on chain stores was graduated on the number of stores of the taxpayer, whether operated in Louisiana or not. The court sustained the Louisiana tax. See also *Butler Bros. v. McColgan,* 315 U. S. 501, 86 L. Ed. 991; and *S. S. Kresge Co. v. Bennett,* 51 F. 2d 353, aff'd by the Supreme Court *per curiam,* 287 U. S. 565, 77 L. Ed. 498.

In *Underwood Typewriter Co. v. Chamberlain,* 254 U. S. 113, 65 L. Ed. 165, Connecticut taxed 47% of Underwood's net profits as attributable to Connecticut, in the face of the showing that only 3% was actually received in Connecticut. The 47% figure represented the proportion of Connecticut real and tangible personal property to total real and tangible personal property. The court found this to be a fair apportionment, saying that Connecticut had "* * * adopted a method of apportionment which, for all that appears in this record, reached, and was meant to reach, only the profits earned within the state. * * * There is, consequently, nothing in this record to show that the method of apportionment adopted

by the state was inherently arbitrary, or that its application to this corporation produced an unreasonable result." The *Underwood* case was approved and followed in *Bass, Ratcliff & Gretton, Ltd. v. State Tax Commission,* 266 U. S. 271, 69 L. Ed. 282, where the right of the state to allocate value was perhaps even more obscure and less demonstrable.

It seems plain to me that there is nothing in this record to show that the statutory method is inherently arbitrary or that its application produced an unreasonable result. There is substantial evidence in the record to show that the result was not inequitable or unreasonable and that it was better than a "rough approximation". This being so, I find no justification for the reversal of the Commission's action and, as I have indicated, think that great harm will be done by a precedent that requires without need a disregard of the corporate entities. I would reverse the court below on this aspect of the matter.

JUDGE HENDERSON authorizes me to say he concurs in this dissent.