HOUSEHOLD FINANCE CORPORATION, A DELAWARE CORPORATION, APPELLANT, v. DIRECTOR OF THE DIVISION OF TAXATION, RESPONDENT.

Argued November 20 and 21, 1961—Decided January 22, 1962.

*Mr. Roger C. Ward* argued the cause for appellant (*Messrs. Pitney, Hardin & Ward,* attorneys; *Mr. Floyd E. Britton,* of the Illinois Bar, of counsel).

*Mr. Alan B. Handler,* Deputy Attorney General, argued the cause for respondent (*Mr. David D. Furman,* Attorney General of New Jersey, attorney).

The opinion of the court was delivered by

WEINTRAUB, C. J.  This case involves assessments against Household Finance Corporation (herein "Household") under the New Jersey Financial Business Tax Law (1946), *N. J. S. A.* 54:10B–1 *et seq.,* for the years 1954 to 1957, inclusive. The Division of Tax Appeals sustained the assessments and we certified Household's appeals before the Appellate Division acted upon them.

The history of the Financial Business Tax Law (1946) appears in *Morris & Essex Investment Co. v. Director of Divi-*

*sion of Taxation,* 33 *N. J.* 24 (1960). As there pointed out, the statute was devised against the backdrop of the federal statute, 42 *Stat.* 1499, 12 *U. S. C. A.* § 548(1)(b), which provides that the tax imposed by states upon the shares of national banks "shall not be at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens of such State coming into competition with the business of national banks." The ultimate criterion under the federal act is whether moneyed capital employed in competition with the business of national banks receives favored tax treatment (33 *N. J.,* at *p.* 30). Our taxing statute seeks to achieve equality despite differences in the underlying economics of enterprises which thus compete with national banks.

To that end the statute imposes "an annual excise tax" at the rate of ¾ of 1% upon "net worth" less certain deductions, which tax is "in lieu of any State franchise tax or of any State or local taxation of, upon or measured by personal property entering into the determination of net worth." *N. J. S. A.* 54:10B–3. With respect to a taxpayer doing business in more than one state, the act provides for an allocation to this State of a portion of its total net worth, "according to the proportion of its gross business in this State to its gross business everywhere during the tax year." *N. J. S. A.* 54:10B–8.

Household is engaged in the small-loan business. It operates extensively in the United States and also in Canada. In the years in question it maintained between 417 and 445 branch offices in the United States, of which 17 were in New Jersey. It also owned subsidiary corporations which in the United States totaled 24 as of the end of 1953 and numbered 155 by the end of 1956. With one exception, not here significant, the subsidiaries were wholly owned by Household. There were no subsidiaries in New Jersey in 1954; there were two in 1955; seven in 1956; and ten in 1957. Of these, one was active in 1956 and four in 1957. The Canadian business was conducted through subsidiaries. The subsidiaries operating in New Jersey are herein called "New Jersey

subsidiaries" although they are foreign corporations, a fact which is of no moment.

The business conducted directly by Household at its many branch offices was the same as that conducted at the local offices owned by the subsidiaries. So also the operating relationship between Household and the local offices was the same whether they were branches or were individually incorporated. The principal headquarters were in Chicago, and regional offices were maintained in New York, Philadelphia, Detroit, and Los Angeles. Policy decisions were made in Chicago. Supervisory and administrative services, including the training and assignment of local supervisory personnel, were handled there. Services were thus centrally furnished in purchasing, leasehold management, research, advertising, and public relations. Each branch office maintained its own books but reported daily to Chicago where duplicate records were maintained. Headquarters supplied the funds needed by local offices, whether branch or incorporated, to meet the business opportunities as they appeared, and the several offices remitted regularly such funds as headquarters decided to recall.

Household concedes its entire operation was unitary in character.

In its returns for the years in question Household sought in effect to separate its direct operations through branch offices from the operations of the subsidiaries. To that end it first excluded from net worth its equity investment in the subsidiaries. It then applied an allocation fraction in which the numerator was the gross receipts of the New Jersey *branch* offices and the denominator was the gross receipts from all *branches*. Thus Household did not include in the denominator the gross receipts of the subsidiaries or Household's receipts from its subsidiaries.

The Director made a redetermination. He included in net worth the equity investment in subsidiaries. He added to the denominator of the allocation fraction the sums received by Household from the subsidiaries, *i. e.*, interest,

dividends and service fees charged for the sundry services Household furnished the subsidiaries. The Director agreed with Household that with respect to the subsidiaries operating in New Jersey (they filed separate returns), the net worth of Household should be reduced by its investment in them in accordance with *N. J. S. A.* 54:10B–6(a)(3). Household's receipts from the New Jersey subsidiaries were not included in the numerator of the allocation fraction.

The redetermination thus followed the corporate lines established by Household. Household then complained that the Director, by taking in the shares in subsidiaries at their book value, in effect "consolidated" the enterprise in fixing net worth, and hence should use a "consolidated" approach in fixing the denominator of the allocation fraction by including therein the gross receipts *of* the subsidiaries, rather than only so much as reached Household *from* the subsidiaries by way of interest, dividends and service fees. The sums so paid to Household were less than the gross receipts of the subsidiaries. Hence, if a "consolidated" approach were used, the denominator of the allocation fraction would be enlarged, thereby reducing the portion of total net worth allocable to New Jersey. As we will later develop, Household did not, however, seek a fully consolidated result.

Household also advanced the further claim that its so-called "headquarter assets" were situate in Chicago, and should be deducted from net worth. This contention in fact departed from Household's returns, since therein it had not sought to deduct headquarter assets from net worth.

The Division of Tax Appeals sustained the redetermination. The issues before us are the ones described in the two preceding paragraphs. We will treat first with the claim that headquarter assets should be excluded from net worth and then consider the attack upon the allocation fraction.

I.

In the years in question the headquarter assets ranged from $21,000,000 to $24,000,000. They included accounts

receivable, government securities, office equipment, and deferred charges, but the great bulk consisted of cash on hand, in banks and in transit. For example, at the beginning of 1954, cash amounted to $22,511,984 of total headquarter assets of $24,098,252. The cash items constituted the revolving fund from which Household dispatched moneys to the various local offices to meet the business opportunities there.

As indicated above, Household argues that these assets have their *situs* in Chicago and that unless they are excluded from net worth, New Jersey would tax extraterritorial values in violation of the due process provision of the *Federal Constitution*.

The statute does not tax assets beyond the State. Rather, it imposes an excise tax upon the doing of financial business in New Jersey. *N. J. S. A.* 54:10B–3. That the tax is assessed upon a portion of net worth does not mean that it is an *ad valorem* assessment upon any of the underlying properties. *Werner Machine Co. v. Director of Division of Taxation,* 17 *N. J.* 121 (1954), affirmed 350 *U. S.* 492, 76 *S. Ct.* 534, 100 *L. Ed.* 634 (1956). Net worth simply sums up the relationship between assets and liabilities and thus expresses the experience of an enterprise. It is not "property" and of course is not an "asset" in a balance sheet. It is merely a concept, without tangible *situs* in any specific asset.

In a sense, the excise tax may gather the hue of a property tax, but if so viewed, it is the franchise to do local business that is being valued rather than any specific piece of property devoted to it. In thus appraising the worth of a franchise, it is fitting to refer to "net worth," for the franchise ultimately contributes to that balance-sheet result. And in dealing with a multi-state business, unitary in nature, it is reasonable to assume the franchise to do business in this State contributes to the net worth in the proportion that the business done here bears to the total business of the taxpayer.

Hence in assaying the value of the business privilege in this State, the important thing is the business done here. In this frame of reference, the location of headquarters was of no moment. Headquarter assets were part of an operating whole, and were employed wherever the taxpayer did business. They were directly employed in New Jersey to the extent that cash was sent here as needed, and the tangible property stationary at Chicago was devoted to New Jersey activities with the same immediate effect as if the equipment were within our borders. Indeed, in terms of the small-loan business to which Household's enterprise was devoted and from which its net worth emerged, the headquarter assets were wholly unproductive within the walls of the home office; they generated results only by meaningful employment at the sundry places where the small loans were made.

If we recur to the legislative purpose mentioned above, i. e., to prevent tax preference for competitors of national banks, we find confirmation of the conclusion we have reached. It is the business done in this State which competes with the national banks. The tax imposed upon competitors should take into account the amount and value of that business. The headquarter assets contributed to the competition in this State as effectively as if that reservoir were here. They accordingly should not be excluded in calculating the net worth of the unitary operation.

In *Household Finance Corp. v. State Tax Comm'n*, 212 *Md.* 80, 128 *A. 2d* 640 (*Ct. App.* 1957), this taxpayer advanced without success the same contention we have rejected. There the taxpayer urged the inclusion of headquarter assets in ascertaining the value of its capital stock violated the *Federal Constitution*. The Maryland court found no substance in the claim.

We think the issue is controlled by *Ford Motor Co. v. Beauchamp*, 308 *U. S.* 331, 336, 60 *S. Ct.* 273, 84 *L. Ed.* 304, 306–307 (1939), where the court said:

"In a unitary enterprise, property outside the state, when correlated in use with property within the state, necessarily affects the worth

of the privilege within the state. Financial power inherent in the possession of assets may be applied, with flexibility, at whatever point within or without the state the managers of the business may determine. For this reason it is held that an entrance fee may be properly measured by capital wherever located. The weight, in determining the value of the intrastate privilege, given the property beyond the state boundaries is but a recognition of the very real effect its existence has upon the value of the privilege granted within the taxing state."

## II.

The remaining question concerns the allocation formula— the statutory fraction in which the numerator is the gross receipts in New Jersey and the denominator is the total gross receipts of the business.

It is settled that an apportionment formula will be sustained unless it is "palpably unreasonable," and the burden is the taxpayer's to prove by "clear and cogent evidence" that it results in the taxation of extraterritorial values. *Railway Express Agency v. Virginia,* 358 *U. S.* 434, 443, 444, 79 *S. Ct.* 411, 3 *L. Ed. 2d* 450, 457 (1959).

To sustain its charge, Household offered testimony of other possible bases of apportionment, such as payroll, assets, *etc.* Its witness conceded all of his suggestions contained some defects. The question is not whether some other technique could be used, but whether the formula the Legislature selected is palpably unfair. An allocation formula based upon gross receipts seems to us to be thoroughly sound when applied to a business such as Household's. Surely the formula does not bespeak an invidious purpose to tax what is not here. And a result of that character is not shown by proof that some basis other than gross receipts would yield a smaller tax. We find no demonstration that a gross-receipts fraction allocated to New Jersey a portion of net worth beyond that in fact attributable to New Jersey business.

The troublesome aspect of this case stems, not from the use of a gross-receipts formula, but rather from the fact that Household operated in part through branch offices and in part through subsidiaries. The Director included in net

worth the value of Household's shares in its subsidiaries. This was plainly correct since the shares were an integral part of the total assets which constituted the strength against which Household was able to borrow huge sums at favorable rates, which sums it parceled out among the local offices for small loans by them. Household does not now question the inclusion of the shares or the use of book value in their valuation. Rather it complains of the allocation fraction the Director used. As we have already noted, the Director, in preparing the allocation fraction, did not include the gross receipts of the subsidiaries, but rather only such sums as Household received from them by way of interest on advances (which was at a lesser rate than the subsidiaries collected on small loans), dividends (as a matter of Household's own policy, the subsidiaries in the United States declared no dividends in the years in question), and service fees which Household received from the subsidiaries.

The Director thus dealt with Household in accordance with its own corporate structure. The redetermination was upon an "unconsolidated" basis. The statute does not authorize a consolidated return. *General Public Loan Corp. v. Director of the Division of Taxation,* 13 *N. J.* 393, 400, 404 (1953). So *N. J. S. A.* 54:10B–6(a)(3) provides there may be deducted from net worth the value of shares "in corporations taxable under this act" upon the formula there set forth. *N. J. S. A.* 54:10B–7 and 8 continue the non-consolidated theme. Indeed by *chapter* 308 of *L.* 1950 the section last cited was amended to provide with respect to multi-state operations that a wholly owned subsidiary having capital stock with a par or stated value of $5,000 or less be deemed, in effect, a part of the taxpayer's direct business operation. The statement annexed to the bill which became that amendatory act reveals the evident purpose of giving "the benefit of the allocation provision" to taxpayers doing business in other states through such subsidiaries, "a situation comparable to that of a taxpayer doing business directly in other States." Thus the Legislature expressly determined

to permit consolidation only with respect to subsidiaries of such limited capitalization.

There is nothing inherently wrong with the statutory plan. The alleged hardship ensued solely from Household's decision to operate in part through subsidiaries. Although the cases recognize that a formula fair on its face may offend constitutional limitations when in its actual operation it plainly taxes extraterritorial property or activity, *Hans Rees' Sons, Inc. v. North Carolina ex rel. Maxwell,* 283 *U. S.* 123, 51 *S. Ct.* 385, 75 *L. Ed.* 879 (1931); *Wallace v. Hines,* 253 *U. S.* 66, 40 *S. Ct.* 435, 64 *L. Ed.* 782 (1920), we know of no case in which constitutional infirmity was grounded upon a refusal to disregard corporate lines.

The issue was advanced in *Household Finance Corp. v. State Tax Comm'n, supra* (212 *Md.* 80, 128 *A.* 2d 640), where a consolidation was found, by a vote of 3 to 2, to be authorized by the statute itself, the majority not reaching the question whether the result was constitutionally required. A similar contention was rejected in *Commonwealth v. Ford Motor Co.,* 350 *Pa.* 236, 245–46, 38 *A.* 2d 329, 334 (*Sup. Ct.* 1944).

We are not told why Household employed subsidiaries. A probable motivation was tax advantage somewhere. The question is whether a state must adjust its tax laws to avoid a disadvantage a taxpayer may experience because of its decision to incorporate a part of its operation. As a general proposition, the answer must be that it is for the taxpayer to make its business decisions in the light of tax statutes, rather than the other way around. See *Higgins v. Smith,* 308 *U. S.* 473, 477, 60 *S. Ct.* 355, 84 *L. Ed.* 406, 411 (1940); *Vim Securities Corp. v. Commissioner,* 130 *F.* 2d 106, 109 (2 *Cir.* 1942); *Bonnar-Vawter, Inc. v. Johnson,* 157 *Me.* 380, 173 *A.* 2d 141 (*Sup. Jud. Ct.* 1961); *Washington Sav-Mor Oil Co. v. Tax Comm.,* 364 *P.* 2d 440 (*Wash. Sup. Ct.* 1961); Annotation, 64 *A. L. R.* 2d 769 (1959).

The authorities just cited may not be precisely in point, since they did not involve the problem of apportionment of

a tax base of a multi-state business. Nonetheless, corporate lines are real. Moreover, taxation is an intensely practical thing, and the administrative burden may well be too much if a state must explore the ramifications of corporate structures to determine the justice of recognizing or ignoring corporate entities in each factual complex.

At any rate we need not decide whether a consolidated approach would have to be allowed in a case in which it cogently appeared an unconsolidated basis allocated a portion of net worth palpably beyond what is reasonably attributable to the New Jersey activity. First, the facts do not demonstrate a palpable misapportionment. *Cf. Norfolk & W. Ry. v. North Carolina ex rel. Maxwell*, 297 *U. S.* 682, 56 *S. Ct.* 625, 80 *L. Ed.* 977 (1936). Second, Household did not seek consolidated treatment.

What Household sought was a hybrid result under which its corporate lines would be respected as to New Jersey operations and disregarded elsewhere. More specifically, Household wanted the right to file separate returns for the New Jersey subsidiaries while using a consolidated approach with respect to the others. It in fact did file separately for the New Jersey subsidiaries, and upon the redetermination insisted before the Director that their net worth be excluded from total net worth under *N. J. S. A.* 54:10B–6(a)(3), a proposition with which the Director agreed. So also Household excluded the gross receipts of New Jersey subsidiaries from the allocation fraction.

After oral argument we sought clarification of Household's position in this respect. We were informed:

"However, the statute (§ 6) requires that Taxpayer's subsidiaries which are active in New Jersey be separately taxed on their own local franchises. The statute shows a clear legislative intent to draw a distinction between the local subs' own franchise to operate locally, which is separately taxable, and the Taxpayer's distinctive franchise to own those subs, which is taxable or not according to where it is held and exercised. Accepting the statutory distinction (as both parties do), the problem is simply to measure the portion of Taxpayer's net worth which represents this value and to determine its taxable *situs*."

and further:

"* * * Moreover, if the disregard of corporate lines appears to be only a partial one (that is, the middle ground under which Taxpayer's New Jersey subs are fractioned off individually), this is solely because of the explicit requirements of § 6, which requirements, incidentally, both parties accept and which therefore should be accepted by the Court as binding for the purposes of this appeal."

Quite obviously, if the gross receipts of the New Jersey subsidiaries were included in the numerator and denominator of the allocation fraction, the fraction would be enlarged. This is apparent from a simple example, let us say, of adding 5 to the numerator and denominator of the fraction 5/20, which would result in the fraction 10/25. If the fraction, augmented above and below the line by the gross receipts of the New Jersey subsidiaries, were applied to the total net worth, the portion allocable to New Jersey would not necessarily be the same as the total of (1) the net worth of the New Jersey subsidiaries and (2) the portion of Household's remaining net worth allocated to New Jersey by a fraction having the New Jersey branch office receipts as the numerator and "consolidated" gross receipts as the denominator. We do not know the tax-dollar consequences for the years in question of that dual approach, but it seems clear that, in espousing the split approach we have described (*cf. Household Finance Corp. v. State Tax Comm'n,* 217 *Md.* 327, 142 *A. 2d* 807 (*Ct. App.* 1958)), Household seeks an opportunity to control its total tax by the expedient of deciding which New Jersey offices to operate through subsidiaries and which to operate as branches.

The statute permits Household to operate in New Jersey through subsidiaries with separate treatment of them. Household simply seeks to fashion still another choice, whereby it may "consolidate" its out-of-State operations while maintaining the integrity of corporate lines with respect to the New Jersey segment of its total operations. The statute does not permit and surely due process does not require that incongruity.

The judgments are affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.